**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

RAQIM WALKER, derivatively on behalf of INSULET CORPORATION,

Plaintiff,

v.

DUANE DESISTO, PATRICK SULLIVAN, CHARLES LIAMOS, BRIAN ROBERTS, ALLISON DORVAL, JOHN FALLON, SALLY W. CRAWFORD, TIMOTHY J. SCANNELL, STEVEN T. SOBIESKI, REGINA SOMMER and JOSEPH ZAKRZEWSKI,

Defendants,

and

INSULET CORPORATION,

Nominal Defendant.

Case No.:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Raqim Walker ("Plaintiff") brings this shareholder derivative action on behalf of Insulet Corporation ("Insulet" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, corporate waste, unjust enrichment, and insider selling during the period from May 7, 2013, through April 30, 2015 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to himself and, as to all other matters, upon the investigation of counsel, which included review and analysis of: (a) regulatory filings made by Insulet with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Insulet; (d) the consolidated complaint filed in *Arkansas Teacher Retirement System, the City of Bristol Pension Fund and the City of Omaha*

*Police and Fire Retirement System v. Insulet Corporation, et al.*, 15 Civ. 12345-MLW, pending in the United States District Court for the District of Massachusetts (the "Securities Class Action"); (e) the complaint filed in *Oliva v. Insulet Corporation*, 16 Civ. 11639-ADB, pending in the United States District Court for the District of Massachusetts (the "*Oliva* Action"); and (f) other publicly-available information regarding the Company.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action asserting claims for breach of fiduciary duty, corporate waste, and unjust enrichment brought on behalf of nominal defendant Insulet against certain current and former officers and members of the Company's Board of Directors (the "Board").

2. Insulet is headquartered in Billerica, Massachusetts, and is a manufacturer of insulin infusion pumps used to treat people with diabetes. In contrast to traditional insulin pumps, Insulet's "pods" are tubeless, are worn on the body for three consecutive days, and are controlled by a handheld, wireless device known as a personal diabetes manager ("PDM"). In 2013, Insulet began selling a new and purportedly improved version of its infusion system, known as the OmniPod Eros ("Eros"). The Eros is more than a third smaller and a quarter lighter than the original OmniPod, while ostensibly maintaining the same features and operating capabilities.

3. On May 6, 2013, Insulet's former Chief Executive Officer ("CEO"), defendant Duane DeSisto ("DeSisto"), touted the Company's launch of its new Eros system by stating that customers' initial feedback was excellent, that Insulet had transitioned all of its new customers to the new Eros, and that as a result, Insulet's growth was surging in both the United States ("U.S.") and overseas. Thereafter, Insulet, at the behest of the Individual Defendants (as defined below) continued to make similarly positive statements to investors and analysts, including statements

that touted the functionality of the Eros, the quality of the Eros, growth of Insulet's OmniPod business and the increase in the number of new Eros patients.

4. The Individual Defendants' statements, however, were materially false and misleading. In truth, from the beginning of its introduction in early 2013, Insulet encountered significant manufacturing and quality issues with Eros – notably with regard to defective needle and alarm mechanisms. Those defects appeared in a significant number of manufactured lots of Eros. As a result of the defects, Eros units did not meet the Company's own quality standards, and Eros experienced frequent production shortfalls.

5. However, when discussing Insulet's manufacturing capabilities and production quality, the Individual Defendants repeatedly misrepresented or failed to disclose that the Company was experiencing significant production problems. On the few occasions when they referred to any quality problems at all, the Individual Defendants assured shareholders and the investing public that any problems that the Company had experienced were unexceptional and had been fully addressed and corrected. Indeed, prior to his departure in the third quarter of 2014, DeSisto insisted that Insulet's quality control process caught any unreliable OmniPod Eros production lots before they ever reached the Company's patients or distributors.

6. In reality, Insulet's manufacturing and quality control issues were chronic and serious, and they had a significant adverse impact on Insulet's ability to: (a) add new customers; and (b) convert its existing customers (especially in the U.S.) to the Eros. The problems caused Insulet's growth in its critical and higher-margin U.S. markets to stagnate and ultimately decline. Nonetheless, rather than disclose the true nature and extent of Insulet's manufacturing and quality problems the Individual Defendants repeatedly misrepresented and concealed the truth from the Company's shareholders and the investing public.

7. For example, the Individual Defendants manipulated the way Insulet reported "new patient starts," which was a critical metric for analysts and investors, so as to mislead financial analysts into believing that the Company was experiencing strong new patient growth in the U.S., when in fact its new patient growth in the U.S. was actually ***declining*** by 2014. Similarly, although the Company reported large increases in sales to its international distributor, Ypsomed Distribution AG ("Ypsomed"), Insulet failed to disclose that those sales were due to Ypsomed's strategy to build up inventory in response to concerns about the Company's ability to maintain quality product supply into 2014, given the extent of Insulet's manufacturing and product quality issues.

8. As a result of these and other misstatements, investors and analysts were shocked to learn, in 2015, that the problems with the Eros roll-out had been much worse than previously disclosed and that those problems had caused the Company's European sales to be artificially inflated well beyond then-existing and sustainable end-user demand in Europe. In addition, the Company's misleading reporting masked a decline in new patient growth in the U.S., and Insulet's much touted growth figures in the U.S. were a complete misrepresentation.

9. The truth concerning the problems at Insulet began to emerge to the public after the close of the market on January 7, 2015, when Insulet disclosed that: (a) it was appointing six new executives from outside of the Company into key leadership positions, and (b) its fourth quarter 2014 revenue would be $5 to $8 million less than the Company's recent guidance. Insulet reported that 2014 revenue would be down from the guidance of $76 to $81 million to only $71 to 73 million, roughly a 7% to 10% miss. Insulet reported that the decline in revenue was due largely to reduced demand for Eros product from Insulet's distributors, which were seeking to reduce their existing inventory levels.

10. Just one week later, on January 14, 2015, the Company presented at a JP Morgan Healthcare Conference. During his transcribed remarks at that conference, the Company's new CEO defendant Patrick Sullivan ("Sullivan") stated that analysts' expectations of Insulet's performance in 2015 were "a tad bit high," and that earnings for the first quarter of 2015 were expected to be flat sequentially over the fourth quarter of 2014. However, immediately after his presentation at that conference, Sullivan held a breakout session with analysts during which he admitted that Insulet's new Eros OmniPod system had experienced serious problems, that the Company's new patient growth in the U.S. had actually been ***declining*** rather than increasing over the past year and that Insulet would be changing the misleading way in which it had been reporting OmniPod sales.

11. Analysts and investors had understood the Company's disclosures concerning "new patient" starts and "new patient increases" to reflect increases in the Company's new patients ***solely in the U.S***. However, on January 14, 2015, Insulet's management ***admitted*** that the Company had, since at least early 2014, been reporting "new patient starts" in a manner that combined new patients in both the U.S. and in Europe.

12. Following this admission, analysts explained that the Company had reported revenue on large amounts of Eros OmniPod sales to Ypsomed, which were unsustainable because Ypsomed had built up inventory levels in 2013 and 2014 well beyond what it could reasonably sell, as a result of which, Ypsomed significantly reduced its future stocking orders. Thus, Insulet's reported "new patient" data had not only been inflated by the Company's previously undisclosed change in its reporting methodology to include overseas patients, but the number of overseas new patient starts was itself apparently inflated by basing it on the artificially high level of Ypsomed "inventory stocking" sales recorded during 2013 and 2014.

13. On April 30, 2015, Insulet again reported extremely disappointing revenue of just $61 million for the first quarter of 2015 ended March 31, 2015, compared to Insulet's prior guidance, issued just two months earlier, of $67 million to $69 million. During the Company's earnings conference call that day, Insulet blamed these results on Ypsomed's efforts to reduce the amount of its excess OmniPod inventory.

14. On the same date, Insulet also disclosed that: (a) it had generated only $39.2 million from its U.S. OmniPod business in the first quarter of 2015, or approximately 4% less than it had generated from its U.S. business in the first quarter of the prior year; and (b) Insulet's overall revenue had declined more than 11%, from $69.2 million to $61.2 million, over the same period. Contrary to numerous statements made by the Company at the behest of the Individual Defendants, which attributed Insulet's increasing revenue to the adoption of the Eros by new users and a growing "customer base," the April 30th disclosures revealed the extent to which previously reported revenue growth was in fact largely attributable to Ypsomed building a large inventory stockpile beyond existing patient demands in Europe as a "hedge" against Insulet's production woes, and the extent to which Insulet's U.S. business was contracting even more sharply than revealed by the Company's January 2015 disclosures.

15. Moreover, on June 5, 2015, the U.S. Food and Drug Administration ("FDA") sent a warning letter (the "2015 FDA Warning Letter") to Insulet which confirmed that Insulet had manufactured ***and shipped*** defective lots of OmniPod Eros product between mid-2013 and the first half of 2014. The FDA inspectors concluded that these lots were "adulterated" because "the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation" were in violation of both "current good manufacturing practice requirements"

("CGMP")[1] and Insulet's own "quality assurance final acceptance criteria." In response, on August 27 2015, Insulet confirmed that it had recalled 40,846 boxes of OmniPod Eros product manufactured between the second half of 2013 and the end of 2015 "due to the possibility that some of the Pods from those lots may have a higher rate of failure than [permitted under] Insulet's current manufacturing standards."

16. Similarly, on an August 12, 2015 conference call just two weeks earlier, defendant Sullivan admitted that, despite prior assurances that any significant manufacturing quality issues with the Eros product had been "corrected" in early 2013, product quality problems had actually continued throughout 2013 and into 2014.

17. On August 11, 2016, Raul Oliva ("Oliva"), who was hired on March 15, 2013, as the Company's Director of Health Care Professional Marketing, filed a complaint against Insulet alleging wrongful termination and retaliation in violation of federal and Massachusetts statutes and Massachusetts common law (the "*Oliva* Complaint"). The *Oliva* Complaint outlines a series of events, shortly after defendant Sullivan took over for defendant DeSisto, but before Insulet had no choice but to begin to come clean as to the Eros' manufacturing and sales shortcomings, in which defendant Sullivan sought to obtain positive reviews for the OmniPod Eros through dishonest means and openly discussed "burying" negative reviews. The *Oliva* Action is still pending.

18. The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the deceptions alleged herein.

---

[1] "CGMP" refers to the FDA's Current Good Manufacturing Practices, also known as Good Manufacturing Practices (GMP), which are guidelines for manufacturing, testing, and quality assurance to ensure that a product is safe for human or animal consumption or use. Insulet as a medical device manufacturer is required to comply with CGMP.

19. The Individual Defendants violated the federal securities law by issuing a false and misleading Proxy Statement on April 3, 2014.

20. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws, Insulet has sustained damages as described below.

**JURISDICTION AND VENUE**

21. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367 (a) because the state law claims form part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

22. This Court has jurisdiction over each defendant because they reside in this district or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Insulet occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

24. Plaintiff Raqim Walker is a shareholder of Insulet, was a shareholder of Insulet at the time of the wrongdoing alleged herein, and has been a shareholder of Insulet continuously since July 19, 2011.

25. Nominal defendant Insulet is incorporated in Delaware and maintains its principal executive offices at 600 Technology Park Drive, Suite 200, Billerica, MA, 01821. Insulet's primary business is the development, manufacture, and sale of its proprietary OmniPod Insulin Management System. Insulet generates nearly all of its revenue from sales of its OmniPod System and other diabetes related products, such as blood glucose testing supplies, traditional insulin pumps, pump supplies, and pharmaceuticals to customers and third-party distributors who resell the products to patients with diabetes.

26. Defendant Duane DeSisto, was CEO, President, and a director of Insulet until September 16, 2014, when he resigned these offices and was replaced in those positions by defendant Sullivan.

27. Defendant Patrick Sullivan has served as the CEO, President, and a Director of Insulet since September 16, 2014.

28. Defendant Charles Liamos ("Liamos") served as a member of Insulet's Board of Directors (the "Board") from 2005, and at all relevant times, until he resigned on May 13, 2015. From January 10, 2011 until January 21, 2014, defendant Liamos served as Insulet's Chief Operating Officer ("COO"). Liamos resigned as COO on January 21, 2014, and subsequently began serving as Insulet's Director, Advanced Technology, a position he held at least through February 11, 2015.

29. Defendant Brian Roberts ("Roberts") was at all relevant times Insulet's Chief Financial Officer ("CFO") until November 6, 2014, when he resigned from the Company.

30. Defendant Allison Dorval ("Dorval") was appointed as the Company's CFO on November 6, 2014, and served in that position until May 4, 2015. Prior to her appointment as CFO, Dorval was Insulet's Controller from 2010 to 2014. On March 30, 2015, the Company announced that Dorval was being replaced as CFO effective May 4, 2015 to pursue "other professional opportunities," which were not specified.

31. Defendant John Fallon, M.D. ("Fallon") has served on the Company's Board since October 2012. Defendant Fallon has been Insulet's Lead Independent Director since February 2015.

32. Defendant Sally W. Crawford ("Crawford") has served on the Board since 2008. Defendant Crawford was the Board's Lead Independent Director from May 2009 to May 2013.

33. Defendant Timothy J. Scannell ("Scannell") has served on the Board since August 2014.

34. Defendant Steven T. Sobieski ("Sobieski") served on the Board from 2006 to 2016. He qualified as an "audit committee financial expert" under the rules of the SEC.

35. Defendant Regina Sommer ("Sommer") has served on the Board since 2008. She qualifies as an "audit committee financial expert" under the rules of the SEC.

36. Defendant Joseph Zakrzewski ("Zakrzewski") has served on the Board since 2008.

37. Defendants DeSisto, Sullivan, Liamos, Roberts, Dorval, Fallon, Crawford, Scannell, Sobieski, Sommer, and Zakrzewski are collectively referred to hereinafter as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

38. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the

Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor. Each of the Individual Defendants were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each Individual Defendant owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40. The Individual Defendants are and were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

- ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or

practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

- ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

41. On May 14, 2007, the Board adopted Insulet's Code of Business Conduct and Ethics (the "Code").[2] The Code sets forth the standards that purportedly guided the Company and its employees, officers, and directors actions.

42. The Code's Introduction provides:

> The Board of Directors of Insulet Corporation (together with its subsidiaries, the "Company") established this Code of Business Conduct and Ethics to aid the Company's directors, officers and employees in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties.
>
> The Company's Board of Directors or a committee of the Board is responsible for administering the Code. The Board of Directors has delegated day-to-day responsibility for administering and interpreting the Code to a Compliance Officer. Our General Counsel, David Colleran, has been appointed the Company's Compliance Officer under this Code. The Company expects its directors, officers and employees to exercise reasonable judgment when conducting the Company's business. The Company encourages its directors, officers and employees to refer to this Code frequently to ensure that they are acting within both the letter and the spirit of this Code. The Company also understands that this Code will not contain the answer to every situation you may encounter or every concern you may have about conducting the Company's business ethically and legally. In these situations, or if you otherwise have questions or concerns about this Code, the Company encourages each officer and employee to speak with his or her supervisor (if applicable) or, if you are uncomfortable doing that, with the Compliance Officer under this Code.
>
> If you are unable to contact the Compliance Officer, or if you do not feel you can discuss the matter with the Compliance Officer, you may contact our Chief Financial Officer, who shall be the alternate Compliance Officer (the Compliance Officer and the alternate Compliance Officer are hereinafter referred to as the "Compliance Officer").

[2] The Code was amended on July 25, 2012, October 24, 2012, September 2, 2014 and July 20, 2015.

43. The Code also provides:

**II. Standards of Conduct**

A. Compliance with Laws, Rules and Regulations

The Company seeks to conduct its business in compliance with applicable laws, rules and regulations. No director, officer or employee shall engage in any unlawful activity in conducting the Company's business or in performing his or her day-to-day company duties, nor shall any director, officer or employee instruct others to do so.

* * *

M. Quality of Public Disclosures

The Company is committed to providing its shareholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled.

* * *

**III. Compliance Procedures**

B. Monitoring Compliance and Disciplinary Action

The Company's management, under the supervision of its Board of Directors or a committee thereof or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee, shall take reasonable steps from time to time to (i) monitor compliance with the Code, and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code. Disciplinary measures for violations of the Code may include, but are not limited to, counseling, oral or written reprimands, warnings, probation or suspension with or without pay, demotions, reductions in salary, termination of employment or service and restitution. The Company's management shall periodically report to the Board of Directors or a committee thereof on these compliance efforts including, without limitation, periodic reporting of alleged violations of the Code and the actions taken with respect to any such violation.

44. During the Relevant Period, defendants Sobieski, Sommer and Zakrzewski constituted the Audit Committee. The Audit Committee maintains its own charter (the "Audit Committee Charter").[3] The Audit Committee Charter states:

> **I. General Statement of Purpose**
>
> The purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of Insulet Corporation (the "Company") are to:
>
> • oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
>
> * * *
>
> **V. Responsibilities and Authority**
>
> **G. Regular Reports to the Board**
>
> • The Audit Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board.
>
> * * *
>
> **VI. Additional Authority**
>
> **B. Legal and Regulatory Compliance**
>
> • The Audit Committee may discuss with management and the independent auditor, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.
>
> • The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

---

[3] The Audit Committee Charter was adopted on May 17, 2006, and was amended on January 22, 2011, May 4, 2011, May 14, 2014, and February 22, 2017.

45. Finally, the Company's most recent Proxy Statement, filed with the SEC on April 1, 2016, provides:

> The business and affairs of the Company are managed under the direction of our Board of Directors.
>
> * * *
>
> The Board of Directors is responsible for overseeing the Company's risk assessment and management function, considering the Company's major financial risk exposures and evaluating the steps that the Company's management has taken to monitor and control such exposures. For example, the Board of Directors receives regular reports from senior management on areas of material risk to the Company, including operational, financial, legal, regulatory, and reputational risks. The Company believes that the leadership structure of the Board of Directors supports effective oversight of risk assessment and management.

46. The Individual Defendants failed to carry out their duties as set forth above, resulting in the breaches of fiduciary duty described herein.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

47. Insulet's primary business is the development, manufacture, and sale of the Company's proprietary "OmniPod" insulin management system. The OmniPod is an insulin infusion system for people with insulin-dependent diabetes. The OmniPod delivers insulation to patients without the usual injections. Patients can wear the OmniPod for approximately three days at a time.

48. Insulet began selling the OmniPod product in the U.S. in 2005. Sales were accomplished either directly to consumers or through distribution partners. In January 2010, Insulet entered into an exclusive distribution agreement with Ypsomed to sell OmniPod products in Europe through 2018. Under the agreement Ypsomed is responsible for re-selling product to end-user patients.

49. One of the important metrics for investors and financial analysts is the number of new patients that begin using the OmniPod, referred to as "new patient starts". Because diabetes

is a chronic, life-threatening disease for which there is no known cure, most customers that begin using the OmniPod system will continue to use it, thereby providing a recurring stream of revenue to the Company.

50. Insulet had a 60% margin on OmniPods sold in the U.S., which was significantly higher than the 20% margin it earned on OmniPods sold outside of the U.S. ("OUS"). Therefore, the number of "new patient starts" in in the U.S was particularly important to investors and analysts.

**A. THE INDIVIDUAL DEFENDANTS CONCEAL MATERIAL FAILURES IN CONNECTION WITH THE EROS ROLL OUT**

51. In 2013, Insulet introduced the new and purportedly improved OmniPod system, "Eros." The Eros was significantly smaller and lighter than the prior version of the OmniPod ("OmniPod2"), but supposedly maintained all of its features. Insulet announced that going forward all of its new patients would begin on the Eros and that it would transfer all of its existing patients to the Eros.

52. Insulet's Eros manufacturing operations and product launch efforts were plagued by a host of critical problems. These problems caused delays that materially undermined Insulet's ability to develop robust growth in new patient starts for Eros and alienated many of the Company's pre-existing customers. In addition, Eros was plagued with defects and quality control issues from the start. These defects included: (a) Eros pods whose needles "misfired," and therefore did not accurately dispense insulin; (b) Eros pods that leaked insulin; (c) Eros pods with faulty alarms, that sounded without reason; and (d) Eros pods that failed when used by pediatric patients.[4]

[4] As mentioned above, the misconduct complained of herein led to the filing of the related Securities Class Action that is currently pending in this Court against Insulet and some of the Individual Defendants. On June 1, 2016, plaintiffs in the Securities Class Action filed a Consolidated Complaint for Violations of the Federal Securities Laws

### 1. Needle Mechanism Failures

53. The Eros works by firing a needle into a patient's skin, thereby beginning the flow of insulin. If the needle does not fire properly, the patient may not obtain the proper dose of insulin. From its inception, manufacturing problems resulted in pods with misfiring needles. As alleged in the Securities Complaint:

> According to a senior quality engineer at Insulet from August 2011 until July 2014 who was responsible for corrective actions, preventative actions and dealing with non-conforming product, the Eros was plagued by needle mechanism failure problems from 2012 through the day she left Insulet in mid-2014. As s/he explained, a patient would have to first attach the Eros pod to his or her body, and then have to "fire" the unit's needle into their skin to receive their dosage of insulin. S/he added, the "needle mechanism failures" were a "major issue for [Insulet]," but even though Insulet's most senior executives – including Defendant DeSisto (CEO) and Defendant Liamos (COO) – were aware that the Company was "giv[ing] product to patients that we know may not work," in the end the decision was always made to ship the product because getting product shipments out the door was critical to Insulet's survival.
>
> A former senior Insulet officer responsible for manufacturing operations who left in the first half of 2014, after more than five years with the Company, was part of the engineering team that converted from the OmniPod 2 to the Eros. As s/he explained, when Insulet switched its design from the OmniPod 2 to the Eros, the Company "changed how the needle fired." The way the needle was firing, and the way the device was put together, the needle was "getting hung up" in the sheath (also referred to as a cannula). When the needle fires, a piece of metal with the sheath at the end of it goes into the patient, but if the sheath is damaged on the way in the needle pulls back and the person is left with the sheath in them but no needle (so the patient may think they are getting insulin when they are not). In sum, "the accusation that we had needle firing issues is absolutely true …" Patients were "pissed off" because when the needle didn't fire right, patients would have to take the Eros pod off and replace it. As s/he explained, ***"every single lot was failing."***
>
> Insulet's former officer responsible for manufacturing operations further stated that s/he was "pretty sure" there were times when Insulet's head of quality control (Ruthann DePietro or Tracey Wielenski) would refuse to sign off on the shipment

---

(the "Securities Complaint" or "CSC"). The Securities Complaint includes excerpts from interviews or consults with various individuals, including former Insulet employees who worked at the Company and current and former employees of entities that did business with the Company, who are knowledgeable about nominal defendant Insulet's business, operations and business practices, and/or about the industry and markets in which Insulet operates. Any references to quotes or information from these individuals in this derivative complaint come from the Securities Complaint.

> of product – but when that happened Defendant Liamos would sign off. The manufacturing operations officer was familiar with the sign-off process because s/he was the person who would sign on behalf of engineering/operations.
>
> Similarly, a pump trainer consultant who began at Insulet in mid-2013, also confirmed the existence of significant needle mechanism problems with the Eros system, such that the needle would not always be injected into the patient. In fact, s/he personally tested the OmniPod system for a time, and personally experienced pods with needles that did not properly "fire" or insert. S/he further stated that as far as s/he knew, Insulet never addressed this problem with its patients. S/he added that although the "tubeless" nature of the OmniPod system was great, the product defect aspects of the pod (including the frequent alarming problem discussed below) were "life threatening, especially for children," as children were less likely to monitor their OmniPod for problems and as a result would be more likely to not get the right amounts of insulin they needed.
>
> A former customer care supervisor who joined Insulet at the beginning of 2014 also responded "oh yeah, it was pretty regular" when asked if s/he was aware of quality or defective manufacturing issues with the Eros product – particularly with respect to the needles not firing correctly.

**2. Leaking Pods**

54. Insulet also experienced manufacturing problems, from the onset of Eros production, which resulted in Eros pods that leaked insulin. For example, as alleged in the Securities Complaint:

> According to the senior quality engineer who worked at Insulet from 2012 to mid-2014, and who was responsible for corrective actions, preventative actions and dealing with non-conforming product, the OmniPod Eros suffered from leakage problems from 2012 through the day s/he left Insulet in mid-2014. As this Insulet senior quality engineer explained, "leaks within the pod" obviously posed problems for Eros users because they would not be getting the full dosage of insulin that they required. As with the needle mechanism failure problems, Insulet's most senior executives – including Defendants DeSisto (CEO) and Liamos (COO) – were aware that the Company was "giv[ing] product to patients that we know may not work," but in the end the decision was always made to ship the product because getting product shipments out the door was critical to Insulet's survival.
>
> According to a regional sales manager at Insulet from 2011 until late 2013, among the product defect problems that s/he recalled from 2013 were leaky pods around the infusion site, where the insulin would leak and the patient would not get the full amount. This regional sales manager also specifically recalled a quarterly sales meeting held at the Mohegan Sun Casino and attended by approximately 65

> people (10-12 from the various regions) where Insulet's then Chief Commercial Officer (Peter Devlin) and Vice President of Sales (Patrick Treanor) told the gathered sales representatives that "internationally there was less than a handful of [product] complaints" about Eros – which left this sales manager incredulous because "we had at least a handful of [product] complaints" just in the room where the meeting was held. Indeed, one Insulet employee that s/he knew actually stopped using Eros altogether because they did not trust the product.

### 3. Defective Alarms

55. The Eros pods included alarms to warn patients when its battery ran low or when there was a problem with the delivery system. From the start of production, manufacturing defects resulted in pods with faulty alarms. As alleged in the Securities Complaint:

> As stated by a regional sales manager who worked at Insulet for more than four years until leaving during the first quarter of 2014, "we had a lot of alarming pods." Pods would alarm for no reason, and the problem increased during the Eros launch. Patients would call customer support, and there would be screaming patients who would call to complain that "they couldn't get past 12 or 48 hours without a [false] alarm" (pods were meant to last up to 80 hours or three days before an alarm was meant to sound for things such as a low battery or a deactivated pod). This regional sale manager stated that when there was an increase in alarms, Defendant Liamos (Insulet's COO) would travel to Insulet's production plant in China (where the Eros was manufactured) in an effort to fix the quality problems; s/he further recalled thinking at the time "if we continue to have this amount of pod problems, how can we continue to sell the product?"
>
> As stated by the former senior quality engineer at Insulet from 2012 to mid-2014, who was responsible for corrective actions, preventative actions and dealing with non-conforming product, the OmniPod Eros suffered from a software defect that caused "unnecessary alarms for occlusion," which indicated that the pump was occluded when in fact it was not. Indeed, s/he recalled that toward the end of 2013 or beginning of 2014, the Company's key European distributor, Ypsomed, became concerned about the needle and alarm defects in Eros. Nonetheless, despite known high defect rates, in the end Insulet's decision was always made to ship the product because getting product shipments out the door was critical to Insulet's survival.
>
> As stated by the former senior Insulet officer responsible for manufacturing operations, Insulet's problems with improperly alarming pods began prior to the [Relevant Period], as the OmniPod 2 system's software was "very, very sensitive." As s/he further explained, the system's high sensitivity would cause the system's alarm to go off based on its detection of an "occlusion" (i.e., blockage) even when there was no such problem – which in turn caused Insulet to "get a lot of complaints" from patients. Unfortunately, these "alarm" problems

carried over to the development of the OmniPod Eros, with Insulet's European distributor Ypsomed reporting continuing issues with the occlusion alarm in 2012 and 2013. As s/he stated, "Time went by and customers got frustrated." There were times when DePietro refused to sign off on product due to the alarm problems, and Defendant Liamos would override her and sign off.

A sales territory manager at Insulet from approximately late 2012 through early 2014 similarly confirmed that there were constant problems and customer complaints involving manufacturing defects with the Eros pods, most of which involved "alarming pods." Patients would call this sales territory manager directly about problems: "the phone wouldn't stop ringing" and it was like "drinking out of a firehose." The calls started in or around May of 2013, almost immediately after the Eros pod was launched in the US. As s/he stated, "it was crazy …. It happened all the time with customer complaints." The sales territory manager was confident that senior management was aware of the problems because "it was a pretty flat managerial structure" at Insulet and this manager (and other territory sales managers) could, for example, "pick up the phone" and call Pat Treanor, the VP of sales, directly. S/he further stated that Defendants Liamos (the COO) and DeSisto (the CEO) were aware of the alarm issue and that the sales reps were receiving huge numbers of complaints. Indeed, this was "common knowledge" at Insulet. Sales reps would talk to each other and discuss how their customers had "got a bad lot," but management would never admit to the sales force in the field that there were any "bad lots."

### 4. Problems Experienced by Pediatric Users of Eros[5]

56. Manufacturer and User Facility Device Experience Adverse Event Report ("MAUDE Report") #3695503 was reported to the FDA on March 14, 2014, which documented certain significant defects with the use of Omnipods by children, as reported by users:

> [A] false low reading, for example the PDM reads 65 when the blood glucose is actually 165, would result in me giving my child 30 carbohydrates with no insulin. After which her blood glucose would be a very high number damaging her eyes, kidneys, veins, heart. . . . This is damaging to every part of her body. We have also had many pod failures. . . . I have spoken with many others having the same problems we are. . . . I do not believe the new system was ready for being put on the market. It has many issues that need to be addressed. Everyone [sic] of these issues is life-threatening and could result in death.

[5] On November 3, 2016, Insulet's President and COO, Shacey Petrovic, stated that 30% of Insulet's patient base currently consisted of pediatric patients.

57. Below are a excerpts from various FDA MAUDE Reports involving children and Eros' failures:

> Report No. 3603244 (Event date – July 11, 2013): "Many of the failures occurred in less than 48 hours of use, with some occurring after as little as three hours of use. Approx. 76 of the pods have worked normally, resulting in a 28% failure rate (29/105 total pods to date)."
>
> Report No. 3760958 (Event date – March 7, 2014): "The customer's parent reported . . . their . . . autistic son was hospitalized . . . he was vomiting so they called his doctor who advised them to take him to the emergency room. . . . The pod was removed, they then noticed the cannula was folded over and it was totally dried."
>
> Report No. 4189290 (Event date – August 26, 2014): "The customer's mother reported that the needle deployed 10 minutes after it was supposed to."
>
> Report No. 4527412 (Event date – January 4, 2015): "The patient's mother reported while sitting in the back seat of the car her daughter's blood glucose result was 60 mg/dl and that she was having a seizure so she was rushed to the hospital in an ambulance. At the hospital a BG meter comparison was performed. Her PDM read 223 mg/dl vs 481 mg/dl for the hospital's meter. She stayed in the hospital for a week before being released."
>
> Report No. 4838212 (Event date – June 5, 2015): "Ever since Omnipod moved to the smaller insulin pod extra insulin has been being released from the pod during flights. I was unaware this was happening. My doctor at the time was also unaware. . . . I have now resorted to literally removing the Omnipod on flights. . . . I am so afraid that a child or someone who is unaware of the issue will go on a flight and have a very serious hypoglycemic event."
>
> Report No. 5134737 (Event date – September 12, 2015): "The patient's mother reported her daughter had to go to the emergency room and that she had been in two comas as results. The doctor believes that there is something wrong with the PDM as the patient's blood glucose keeps going from low to high."
>
> Report No. 5207721 (Event date – October 10, 2015): "Our son has an Omnipod insulin pump. He has had 3 pods that failed to deploy the needle and insert, but when deactivated and taken off and set down with a little jolt all three deployed after removal."

## B. THE INDIVIDUAL DEFENDANTS' DELIBERATE DECISIONS TO SHIP DEFECTIVE PRODUCTS LEAD TO FURTHER REDUCTIONS IN SALES

58. Eros's defects were pervasive and severe, and they defied "quick fix" solutions that might have enabled the Company to put these problems in the rearview mirror. However,

rather than candidly disclose the true scope of the product quality problems that faced the Company, the Individual Defendants concealed the problems and approved shipments of product they knew to be defective.

### 1. Production Problems Cause Material Delays with the Roll-Out of the OmniPod Eros

59. On numerous occasions during the roll-out of the Eros, the Individual Defendants represented to investors and the public that Insulet could not keep up with customer demand. The Individual Defendants failed to disclose, however, that Insulet's inability to meet customer demand was caused by manufacturing defects that delayed production. For example:

> As Insulet's former senior officer responsible for manufacturing operations stated, quality issues contributed to Insulet not being able to meet the demand.
>
> As the former regional sales manager who worked at Insulet from January 2010 through March 2014 similarly stated, Insulet's senior management was "very creative with investor calls." For example, s/he described how, repeatedly in the years prior to his/her departure in the first half of 2014, it was apparent that the sales force was "not making the numbers [management] wanted" -- and the volume of phone calls from "irate customers" that Insulet was experiencing only confirmed that the Company could not be doing well. Nonetheless, s/he observed that Insulet's senior management always managed to "spin" the Company's quarterly reports to make it seem as if things were going well.

### 2. The Deliberate Shipment of Defective Product and Other Irregular Practices

60. To conceal the extent of the Eros's manufacturing problems, the Individual Defendants, led by defendants DeSisto and Liamos, approved the shipment of Eros despite their knowledge (or at minimum, recklessly disregard) that the product did not meet the requisite quality levels. For example:

> As stated by the senior quality engineer at Insulet from August 2011 until September 2014, despite the known needle, leakage and false alarming problems with the OmniPod Eros, there was always a "big push" to release even defective product shipments into the market. When s/he joined Insulet in August 2011, Insulet required an outgoing quality level of 98%, which meant that Insulet had a high confidence level that what it was releasing was good product and Insulet

would not ship product that did not meet the requisite level. However, by the second and third quarters of 2013, Insulet released product that it knew had an outgoing quality level of as low as 68%. Such product would include both "Severity-A" failures, such as the needle mechanism failure and leaking pod problems, and "Severity B" failures, such as the defective alarm problem. S/he further noted that Defendants CEO DeSisto and COO Liamos had "signature authority" to release product and that Liamos "was the biggest push there." Specifically, products with "Severity A" failures, such as the needle mechanism and leaking pod issues, required senior management, typically Liamos or DeSisto, to sign off, in addition to a quality and regulatory signature from Ruthann DePietro. S/he confirmed that if DePietro wouldn't sign, Liamos would sign for her. S/he further recalled "ongoing back and forth discussions" along the lines of "Do we give product to patients that we know may not work? Or do we not give it to them?" ***In the end, however, the decision was always made to ship because if Insulet did not ship the product the Company might fail***.

Insulet's former senior quality engineer further confirmed that it was her/his responsibility to clear lots that were flagged as defective, which meant having to go to Defendant DeSisto (the CEO), Defendant Liamos (the COO), DePietro or Tracey Wielenski (V.P. for global regulatory, clinical affairs and quality assurance from January 2013 to March 2015) to get signatures to approve such lots for shipment. S/he recalled that s/he took issue with Insulet shipping lots out to the public that they knew were going to fail, which included lots that were tagged with an orange paper indicating that it was a non-conforming lot. As s/he put it, "it was an issue when the statement 'ship it' became pretty popular. No matter what, we're gonna ship it." As/he recalled, others would look at a lot, typically valued at around $250,000, and ask "How can we throw that away?" Indeed, s/he confirmed: ***"There was never a lot rejected."***

As Insulet's former senior quality engineer further described, one popular "solution" to the quality problem was to deliberately ***"blend"*** defective with non-defective lots. S/he explained the process as follows: If a lot did not meet the requisite outgoing quality level, Insulet had to go through what was meant to be a rigorous process to determine if patients would be better off with the defective devices than not before it would ship them. ***If a lot was at 70 or 74%, for example, even though DePietro or Wielenski might not "sign off" on releasing the lot, "Duane [DeSisto] and Charlie [Liamos] would" – and there was "never a case that they scrapped a non-conforming product, no matter what the quality level."*** For example, s/he recalled a time when a lot "went down to 68%," which meant that 32% of the lot would result in Severity A or Severity B failures. As s/he explained: "[W]e were letting [lots] go at 68%." In sum, based on internal documentation of the outgoing quality levels, these lots "should not be released," and "the only way it gets released is senior management," typically Defendants Liamos or DeSisto, signed off on it.

Moreover, when asked about the "process" that the Company used to justify sending out non-conforming shipments, Insulet's former senior quality engineer

simply said "they put together a story." To try to conceal the extent of defective lots and maintain product shipments, Insulet's senior quality engineer further explained how Insulet would blend lots with lower defect rates with lots that had 80% to 90% failure rates, so that the overall expected failure rate for a given shipment as a whole would be decreased.

Insulet's former senior quality engineer served in roles that were similar or more senior than her/his role at Insulet at other medical product companies, and noted that having some product defect issues in a given lot is part of the normal course of business – but none ever released lots with the kind of high failure rates that repeatedly occurred at Insulet. Instead, based on her/his more than three years with Insulet, the OmniPod product defect rates were "***much more extreme***" than what s/he had ever seen, ***and the rule at Insulet was that they were "not scrapping lots" and "losing a quarter million dollars" on a defective lot***.

Insulet's former senior quality engineer from 2009 through 2014 similarly stated that "every single lot was failing." S/he was also familiar with Insulet's practice of ***"blending"*** unacceptable lots with better quality lots in order to justify sending out greater overall amounts of product. S/he was "positive that the Quality Department was extremely unhappy with blending." Indeed, s/he explained that this was one of the main reasons why, in several cases, DePietro refused to sign off on product. In those instances, Defendant Liamos would sign for DePietro. S/he further confirmed that patients getting defective pods would, understandably, become aggravated. For example, Ypsomed was vocal in complaining that there were a lot of patients in Germany who became aggravated with the quality of Insulet's pods, and was so upset that Insulet that privately agreed to start shipping Ypsomed "lots that tested better."

As the former regional sales manager at Insulet from January 2010 until March 2014 stated, "I know it's a sales business but at some point you've crossed the line." While s/he noted that having some defective product was to be expected, the problem at Insulet was that management was "so focused on sales that they didn't want to hurt the numbers," which is what would have happened had the Company not sent out so much defective product. In sum, as s/he observed, "if you know these pods are not going to work, don't send them out." S/he also heard reports from other sales managers and the home office that management was "cherry- picking the pods [for shipment]" and knew which areas were going to get hit with the poorer quality pods; in other words, Insulet was knowingly "rotating shoddy pods, when there was a bad test lot, to various territories." Accordingly, s/he would try to find out internally what lot numbers were "having issues" so s/he would have some advance notice if "sh—tty box[es]" were being sent to their customers. S/he even recalled that the son of a senior Insulet manager ended up receiving pods from a defective lot, and was furious because the manager thought s/he should have at least been told in advance that the product was from a lot that Insulet had flagged as defective.

A reimbursement coordinator at Insulet from 2010 to May 2014 described that another manipulative tactic that Insulet engaged in was to send pods to patients even if they were not covered by their insurance. This "happened on numerous occasions." Although doing so was technically against company policy, no one ever seemed to do anything about it – even though the Company was aware of the problem because when such pods were returned, the returns "got taken off the salespeople's numbers," meaning that their compensation was reduced. This practice was "pretty well known [among] reimbursement personnel and sales people" at Insulet, including her/his supervisor, Jillian Avery Snow (the Company's senior manager for intake operations). Indeed, s/he raised her/his concerns about this practice with Avery Snow repeatedly throughout her/his employment with Insulet, including through multiple meetings with Avery Snow. In addition, s/he personally kept track of "habitual" bad practices, such as the Company's practice of shipping pods to patients that were not covered by their insurance. S/he was concerned that Avery Snow was not being proactive in handling this issue and instead would "blow things off. Rather than try to correct the problem, Avery Snow would simply say "it is what it is" and "turn the other cheek to things that weren't being done appropriately." When asked if senior management also seemed disinterested in addressing these issues, she responded that, "Sales was a priority for them so they let a lot of things go. They didn't want to affect their sales."

The sales territory manager at Insulet from approximately late 2012 through early 2014 similarly confirmed that sales personnel would have their commissions "docked" if product was returned, regardless of the reason. If a quota was 40 new patients, and the sales person only made 39 sales, "that would cost a couple grand or more in commission."

### 3. The Individual Defendants' Decisions to Ship Defective Product Led to a Material Increase in Customer Complaints and Product Servicing Requests that Insulet Was not Equipped to Address

61. During the Eros roll-out, Insulet received a significant number of customer complaints and requests for product support. Insulet's customer support was understaffed and not properly trained, which led to increased frustration among customers. For example:

The regional sales manager who worked at Insulet from 2011 until late 2013, confirmed that Insulet "absolutely" was experiencing significant problems with converting their customers over to Eros in 2013 (before s/he left the Company at the end of that year). In particular, there were "significant problems converting because we didn't man our customer care environment enough." Patients would contact customer service and not get callbacks "for two or three weeks, if at all" – a problem that s/he attributed to a severe understaffing problem and Insulet's "lack of bandwidth to run [customer service]." Poor product quality compounded the problem, because -- although there was limited supply of Eros pods – patients

would have to order new pods when the ones they had failed. These problems lasted at least through her/his departure in late 2013, and s/he added that it was "well documented on email" at Insulet that there were significant issues with product quality, customer service, patients that ran out of supplies due to receiving defective product, and related problems that the Company experienced in trying to navigate these issues.

As the former regional sales manager who worked at Insulet from 2010 through early 2014 similarly noted, Insulet patients also experienced shortages because of the number of pod replacements that would be required because of defective pods, leading to dissatisfied customers. Indeed, during the [Relevant Period], her/his sales reps "were so busy putting out fires that they [didn't have time] to sell [to new customers]." In other words, they had to spend all their time dealing with complaints from existing customers so that they wouldn't lose them as customers. As s/he put it, "2013 was a year of complaints and issues …" and Insulet "went through hell a couple of times." Moreover, so many customers demanded to speak to a more senior manager about defects in their pods that Insulet's chief commercial officer Peter Devlin, its vice president of sales Pat Treanor, and its senior director for managed care and national accounts, Dino Tsamparlis, amongst others, would end up talking to irate patients. It was the "Peter, Pat and Dino show … Peter, Pat, everyone was talking to patients." When asked how Devlin, Treanor and other more senior managers would deal with these calls, s/he stated that "they would just say that they're looking into the quality of the pods," but would also try to "figure out a way to blame the customer" and explain away defective product problems as "user error." In the meantime, during 2013 and through the time s/he left the Company in the first half of 2014, "there were so many [Insulet] customer service people that quit [that] it created a lot of angry customers."

### 4. Deteriorating Demand

62. By 2014, the demand for Insulet OmniPod products had leveled off, which caused further financial difficulties at Insulet. However, at the same time the Company represented to investors and the public that it was continuing to experience strong growth in demand for its OmniPod infusion products.

#### (a) Ypsomed and Flattening Demand in Europe

63. At the outset of the Eros launch, Insulet's key European distributor, Ypsomed, was concerned about Insulet's ability to produce a sufficient volume of product to meet demand. As a result, Ypsomed ordered massive amounts of Eros, far exceeding its expected customer

demand, in an attempt to ensure that it had sufficient product. By the end of 2014, however, Ypsomed's accumulated stock of inventory far exceeded demand from European customers. As a result this over-supply, Ypsomed significantly curtailed its purchases. The Individual Defendants were aware that Ypsomed's inventory far exceeded demand and that Ypsomed could not maintain its level of purchases. However, they failed to disclose that Ypsomed's purchases were artificially inflated or that Ypsomed would not be able to maintain such purchase levels. For example:

> The former senior quality engineer at Insulet stated that s/he was familiar with Ypsomed in part because s/he had worked with them in previous jobs, and s/he confirmed that Insulet "absolutely" pushed Ypsomed to purchase more product than it could sell. S/he added: "The push was at the end of the quarter, all the time to [have Ypsomed and other distributors] buy unnecessary inventory so [Insulet] could hit their numbers at the end of the quarter." The need for this "push" was "discussed openly" within Insulet. S/he was aware of these discussions largely in the context of her/his tracking of defective product and because s/he was responsible for doing investigative analysis to determine if product could be released. The push to ship defective product lots would arise at the end of each quarter, when management would need to get defective lots "released in a timely manner." Such discussions were "common knowledge" at Insulet.
>
> As Insulet's former senior officer responsible for manufacturing operations also confirmed, Ypsomed was "mad" at Insulet because, although they were contractually obligated to buy a certain amount of Insulet pods, "sales weren't good" because Ypsomed did not get enough Eros pods, and to the extent that it did get the new Eros pods many of its customers were upset by the manufacturing defects in that product.

#### (b) The Individual Defendants Deliberately Misrepresent the Amount of New Patient Starts in the United States

64. Prior to 2014, Insulet's reports of "new patient starts" included only domestic new patient figures. In early 2014, at the Individual Defendants' direction, Insulet began to report new patient start metrics that included both domestic and foreign "OUS" patients. However, Insulet did not disclose that the reported metrics included OUS patients, despite knowing that the

market and Wall Street analysts believed that the "new user" counts and increases reflected only new patients from within the U.S.

### (c) Decreased Demand in the United States

65. Insulet regularly pressured its U.S. distributors to purchase more product, including product Insulet knew to be defective, than the distributors needed. Insulet pushed sales of the defective product despite knowledge that many U.S. patients had become frustrated with quality control issues. For example:

> As the former senior quality engineer at Insulet stated, "The push was at the end of the quarter, all the time to [have distributors] buy unnecessary inventory so [Insulet] could hit their numbers at the end of the quarter." The need for this "push" was "discussed openly" within Insulet. S/he was aware of these discussions largely in the context of her/his tracking of defective product, because the push to ship defective product lots would also arise at the end of each quarter, when management would need to get defective lots "released in a timely manner."
>
> That senior quality engineer also noted that the initial Eros product shortages in the United States during the U.S. Eros roll-out took a significant toll on Insulet's ability to sign up new patients, as the majority of prospective new patients would get fed up with the length of time it could take to get signed up for and receive the new Eros product. "We had a lot of complaints about turnaround time," and although the sales staff would get "lots of leads" the "majority" of new prospects would choose another pump because of delivery and customer service problems. S/he also noted that when prospective new patients would send in their forms to various companies so they could start getting needed insulin products, the wait time was longer at Insulet than it was at Insulet's competitors.
>
> The sales territory manager at Insulet from approximately late 2012 through early 2014 also confirmed, the Eros product shortages meant that Insulet's efforts in 2013 to significantly increase their direct marketing efforts to endocrinologists were problematic. As this sales territory manager stated, many doctors wouldn't recommend the product if there was no ready product inventory. In addition, even when doctors would recommend a patient, Insulet's customer service and enrollment practices were too slow to be competitive, as Insulet would need to contact patients at least three times to get consent to investigate their insurance provider, do a benefits investigation, and then (after Insulet obtained a signed statement of medical necessity from the patient's doctor) get a final "yes or no" from the patient. As a result, there was "mammoth attrition" because new patients would drop off during the process, as the sales cycle became so stretched out that new patients would go with a different product.

A consultant who was brought in to help improve Insulet's sales and related new-patient intake training from early 2014 through 2015 also described how Insulet had on average a 30 day wait time for a customer to receive a pod – whereas "Medtronic had [this process] down to a science," with the result that its customers would be able to get their pods much quicker.

In short, as the sales territory manager noted in paragraph c above, even though Insulet did a good job of creating initial demand for Eros in the first half of 2013, at the beginning of its planned Eros product launch in the U.S., matters quickly devolved into a "major inventory issue," "running out of pods" and a substantial inability to execute on the promises that Insulet had made to its existing patients to convert them promptly to the new Eros product – the net result of which resulted was a "big ol' disaster" that "everyone" in the Company knew about.

Similarly, the customer care supervisor who joined Insulet at the beginning of 2014 stated that (although it was before his/her time) s/he had heard "all the stories" about how it had been "a nightmare" trying to convert existing OmniPod customers to the new Eros product in 2013 because of manufacturing defect issues and related supply problems – and because existing customers were upset about Insulet sending the Eros product only to new patients in 2013 despite their prior loyalty to the OmniPod. Indeed, s/he stated, "That's one of the biggest complaints we got." A "considerable number" of patients left because of quality issues. As s/he further reported, because there was not a "patient retention team" at the time, "a lot of [existing] customers left." Insulet's lack of adequate customer service staffing, however, continued into 2014 and 2015, as Insulet "never had enough staffing." For example, when a patient got new insurance, there were never enough staff to handle the paperwork, "and when you're doing hundreds and thousands of intakes a month, things fall through the cracks." More specifically, Insulet lost significant numbers of customers because of inadequate customer support staffing, as patients would have to constantly call and follow-up with everything, and would ultimately get frustrated and go elsewhere.

## C. THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### 1. False and Misleading Statements and Omissions in Connection with the Announcement of Insulet's First Quarter 2013 Results

66. On a May 6, 2013, conference call, defendant DeSisto touted Insulet's launch of the Eros, stating, *inter alia*, that during the quarter "[Insulet] transitioned all [of our] new customer starts to the new [Eros], ***and the initial feedback has been excellent***." Defendant DeSisto further represented that new referrals and overall [Eros] shipments had ***increased by more than 40%*** since March 1, 2013, as compared to the prior year. According to defendant

DeSisto, in the prior month, these metrics had increased even more rapidly, by more than 50% compared to the prior year.

67. During the call, defendant DeSisto represented that "***2013 is off to a great start*** as we continue to ***make significant progress across all aspects of the business highlighted by the launch of our new [Eros]***. . . . ***The results have been impressive***. … In summary we are extremely pleased with the launch of [the] next generation OmniPod ***and initial feedback across the country has been exceptional***."

68. Defendant DeSisto did note that Insulet had experienced an "unexpected component issue," which resulted in lower than expected production in the latter few weeks of the first quarter. However, he represented that Insulet had already corrected the problem and that the delay would only have a minor impact on the Company's program to transition existing OmniPod 2 patients to the Eros. Defendant DeSisto stated:

> With [our] significant uptick in demand we did make the decision to delay the transition of existing customers [to Eros] for approximately 90 days in order to build additional [Eros] supply. While the manufacturing process continues to improve, we had an unexpected component issue that resulted in lower than planned production in the latter part of Q1 . . . [that] was quickly identified ***and remedied***. . . . At this point, we expect that conversion [of existing patients to Eros] will start in the next few weeks and we remain confident that nearly all customers will be transitioned by the end of the third quarter.

Similarly, defendant Roberts praised defendant Liamos, for "doing a fantastic job working with [Insulet's Chinese manufacturer, Flextronics] and all of our suppliers to really . . . move the manufacturing process here in the short term."

69. In response to an analyst question, which sought further comfort that all manufacturing problems had been resolved, defendant DeSisto confirmed that they had been:

> Analyst: Just first on the component issue, I want to make completely sure. ***So you are fully resolved and you are building inventory***. Do you have inventory

levels today that will support that transition [for existing patients] or do you think you will have that by the end of the month?

DeSisto: I think where we are, we will have inventory levels here in the next few weeks that we will start converting people in the quarter . . . but today, as of today no. . . .

Analyst: ***And the component issue is fully resolved[?]*** They are shipping – you're getting the components in so that you can build the inventory, so it's just a [manufacturing] capacity issue?

DeSisto: . . . .***The answer to your question is yes.***

70. Defendant DeSisto also represented that the Company's quality control programs were so effective that they ensured that defective product "never left the building." Defendant DeSisto stated:

Analyst: ***So where did you find the manufacturing and component issue, in the field or internally in QA [Quality Assurance]?***

DeSisto: . . . .***Where we found it was in QA.*** So line one was running pretty well. Line two, we've automated a couple of stations from line one to help continue to drive the cost out and in that automation process is where it kind of popped out. ***So the product never left the building*****.** . . . And we noticed like I said, we noticed basically an eyelash of tolerance difference in the particular product, the components going to that line and ***that's how we caught it.***

Analyst: ***Okay, so internally. That's the key.***

DeSisto: ***Yeah, never saw the light of day.***

71. In response to an analyst's question about "international sales growth in the quarter either year-on-year or relative to the fourth quarter of 2012," defendant Roberts stated: "[C]ompared to Q1 of 2012, which was probably much lighter in volume, it was probably more than triple what the number was back then and it was an uptick over Q4 of 2012. They – ***Ypsomed has done a great job of accelerating demand.***"

72. Securities analysts reported on and accepted defendants DeSisto's and Roberts's statements concerning the Eros roll-out, patient growth and the complete resolution of any

manufacturing problems. On May 7, 2013, JP Morgan issued an analyst report that repeated the Company's commentary by stating that "Insulet's new OmniPod launch has been well received in the marketplace." Noting that "[t]here was increasing investor concern in recent weeks around a delay to the Eros OmniPod launch," JP Morgan also reported that it had been reassured by the Company that "the [component] issue" that had briefly contributed to this delay "has since been corrected and affected product never left the plant." Likewise, a May 7, 2013 report by Jefferies recounted that the Company had experienced a "minor manufacturing issue," but that it had "since been resolved." Analysts from JMP Securities also reported on May 7, 2013 that Insulet had experienced a "minor component issue," but emphasized defendants DeSisto's representations that this "minor" issue "had been identified and remedied." Other analysts from Oppenheimer and Piper Jaffray, published similar reports on May 7, 2013.

73. On May 8, 2013, Insulet filed its quarterly report with the SEC on Form 10-Q, which was signed by defendants DeSisto and Roberts. The Form 10-Q falsely represented that Insulet's patient base was expanding:

> Our total revenue was $57.4 million and $47.8 million for the three months ended March 31, 2013 and 2012, respectively. ***The increase in the three month period is due to continued adoption of the OmniPod System by patients in the United States and internationally,*** as well as expansion of sales of other diabetes supplies to our existing patient base.
>
> * * *
>
> Cost of revenue was $32.2 million and $27.5 million for the three months ended March 31, 2013 and 2012, respectively. The increase in cost of revenue is due to higher sales volumes ***as our patient base continues to increase.***

74. The Form 10-Q also stated: "We believe our current manufacturing capacity is sufficient to meet our expected 2013 demand for OmniPods."

75. The statements set forth in ¶¶ 66-74 were, however, materially false and misleading, and omitted material facts, as follows:

a. Contrary to the defendants DeSisto's and Robert's statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Insulet had not remedied the defects and the Company knowingly shipped defective product to distributors and patients;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user base was negatively impacted; and

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems.

### 2. False and Misleading Statements and Omissions In Connection With the Announcement of Insulet's Second Quarter 2013 Results

76. On August 7, 2013, after the close of the financial markets, Insulet announced its financial results for the second quarter of 2013 and held an earnings conference call. Defendants DeSisto and Roberts once again reassured investors that the Company had had an "outstanding quarter," and reiterated that Insulet had no outstanding material manufacturing issues and thus

had the ability to increase manufacturing production to ensure that the Company would have sufficient inventory to keep the Eros roll-out on track. In addition, management advised that, as a result of certain cuts to Medicare reimbursement rates for diabetes testing supplies, Insulet would stop selling those supplies – and that the quarterly revenue Insulet generated from its wholly-owned Neighborhood Diabetes supplier subsidiary would decline from roughly $12 million to roughly $7 million per quarter (or from roughly $48 million to roughly $28 million per year). But analysts did not seem unduly concerned by this disclosure, because Insulet's margins on Neighborhood Diabetes' remaining revenue streams were relatively low and the $5 million loss in revenue from the sale of diabetes testing supplies was expected to be offset by the growth in Insulet's OmniPod business.

77. Defendant DeSisto went out of his way to assure investors that Insulet had not experienced any significant manufacturing problems while ramping up its production of Eros:

> As we accelerated the production, we have had to overcome some minor hiccups over the last few months. Some of these normal cost challenges have been resolved within a matter of hours. Yet, with the inventory levels low, the team remains keenly focused on assuring that we are producing at a rate to satisfy our growing demand. . . .
>
> * * *
>
> . . . .Charlie [Liamos] and these guys, like I said, we are now producing more of the new product than we've ever produced on a given day of the old product. . . . So there's always – you look at all these kind of ***normal little interruptions*** that happen every day all across the world in every manufacturing company. ***It's not a big deal***.

78. Defendant DeSisto also assured analysts that the Company was experiencing huge demand for the Eros and no negative feedback about the product during the roll-out process:

> I would tell you if you – the two biggest complaints [from patients] that we are having at the moment, which is pretty simple, is "I want it and I want it now" and "I don't care what the insurance says [about my eligibility to be upgraded]". . . .

> So, I would tell you – I'm not sure what we would do differently. I'm still trying to work through that. ***But I think the only complaint that we've heard is our customer service lines are being jammed solid*** [with patients wanting to transition]."

79. Similarly, in response to a question about the relative failure rates of the old pods to the new Eros pods, defendant Roberts did not disclose the significant product defect rates that Insulet was experiencing with the Eros. Instead he simply commented that: "I think it's pretty early days [to assess failure rates]," and added "[s]o from customers who are transitioning to the new pod, sometimes they think they've had a couple of failures but once we've spoken to them, it's really just kind of that change in training, and we work them through that and they're good to go."

80. On August 8, 2013, Insulet filed its quarterly report with the SEC on Form 10-Q, which was signed by defendants DeSisto and Roberts. In multiple places in the Form 10-Q, the Company represented that its patient base was expanding:

> Our total revenue was $60.1 million and $117.4 million for the three and six months ended June 30, 2013 compared to $51.0 million and $98.8 million for the same periods in 2012. ***The increase in the three and six month period is due to continued adoption of the OmniPod System by patients in the United States and internationally***, as well as expansion of sales of other diabetes supplies to our existing patient base.
>
> * * *
>
> Cost of revenue was $33.3 million and $65.5 million for the three and six months ended June 30, 2013 compared to $28.7 million and $56.2 million for the same periods in 2012. ***The increase in cost of revenue reflects the higher sales volumes as our patient base continues to increase.***

81. The August 8, 2013, Form 10-Q also stated: "We believe our current manufacturing capacity is sufficient to meet our expected 2013 demand for OmniPods."

82. Once again, the Company's August 7, 2013, statements and assurances were accepted by the market. For example, in an analyst report dated August 8, 2013, JP Morgan told

investors that "[d]espite modest disruption to near term ordering patterns [as a result of transition existing patients to the new Eros product], the new OmniPod launch is by all accounts going very well." Moreover, JP Morgan noted that "We view new patient adds as the key leading indicator for Insulet's growth," and viewed the commentary and reported results as a "solid update."

83. The statements set forth in ¶¶ 76-81 were materially false and misleading. The Form 10Q omitted material facts, as follows:

a. Contrary to defendant DeSisto's and Robert's statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been "remedied," and even though they had been identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user base was negatively impacted;

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros

inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems; and

d. The Individual Defendants failed to disclose the extent to which Insulet relied on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth.

### 3. Defendants' False and Misleading Statements and Omissions Made at the Canaccord Genuity Growth Conference

84. On August 15, 2013, defendant DeSisto presented at the Canaccord Genuity Growth Conference. At this conference, defendant DeSisto again failed to disclose Insulet's quality control problems with Eros. Instead, defendant DeSisto stated:

> ***But the real key of the whole thing is the ability to manufacture this***. This is a class II medical device, and if you really step back and think about what it is, you are making a device that delivers one of the most – by the FDA's categorization, one of the most dangerous drugs that you can possibly deliver, which is insulin, and ***you have to do it in a safe, efficacious manner***.

He again reassured investors that the Company was on track in all respects:

> In terms of where we are, you can see the growth rate for the company. ***We are on track I think we are pretty much spot on where we said we'd be through the first six months of this year***. We're pretty excited about it. . . . Once again, very clearly, if you look at it, we have a pretty predictable model. Kind of put in perspective for everyone, our handhelds we sell for between $500 and $600. It's probably – our average sell is probably about $27 every three days in terms of pods. It becomes very, very predictable for us.

85. Defendant DeSisto also touted Eros sales growth through its European distributor: "Ypsomed is probably four, five months ahead of us in terms of when they had the product and transitioned it, and ***they're still growing rapidly – very rapidly***."

86. The statements set forth in ¶¶ 84-85 were materially false and misleading, and omitted to disclose material facts, as follows:

a. Contrary to defendant DeSisto's statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been "remedied," and even though they had been identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user based was negatively impacted;

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems; and

d. The Individual Defendants failed to disclose the extent to which Insulet relied on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth.

### 4. False and Misleading Statements and Omissions In Connection With the Announcement of Insulet's Third Quarter 2013 Results

87. On November 7, 2013, Insulet announced its financial results for the third quarter of 2013 and held an earnings conference call. During the call, defendant DeSisto highlighted the new patient starts for Insulet's new product: "[T]he new smaller OmniPod [Eros] continued to receive an ***extremely enthusiastic response*** in the marketplace. Demand for the OmniPod continues ***to exceed our expectations with new patient starts***, ***more than 40% higher*** than a year ago with no signs of this growth slowing in Q4." Later in the call, he represented that "***[n]ew patient starts remain extremely strong*** and we continue to see more than 70% of our customers to be first-time pumpers."

88. Defendant Roberts also touted Insulet's new patient starts, stating that ***"[n]ew customer additions continue at a rate in excess of 40% year-over-year since launch***, and we expect to continue to achieve these levels in Q4." When an analyst asked defendants DeSisto and Roberts to "confirm for the third quarter . . . your new adds," Roberts answered, "Definitely up over Q2's numbers. Again, like I said, ***north of 40% year-over-year increase*** from where we were in Q3." Later in the call, Roberts declared that "we have seen no signs whatsoever of patient starts slowing down."

89. Defendants DeSisto and Roberts also emphasized patients were clamoring to get transitioned as soon as possible and that the only significant issues in effectuating the transition had been the volume of patients who wanted to transition at the same time (rather than in a more orderly "staggered" fashion). Defendant DeSisto stated:

> In summary, we had exceptionally strong performance in the third quarter. The transition of basically the entire customer base in such a condensed time period was nothing short of moving a mountain. ***We're pleased to have that hurdle behind us.***

* * *

> . . . .[W]hen we kind of laid it out this year, the quarter we worried about was the quarter we were going to go through this transition. And it was, I guess it was every bit as painful as we imagined, but we're pretty happy with how it turned out. We think we're in a real good spot and we really are now focused on go-forward.

Defendant Roberts stated:

> Finally, as Duane noted, we remain very positive about our prospects for 2013 and beyond. The new OmniPod continues to generate excitement in the industry. And with the existing customer base transition behind us, we're solely focused on growing the business. . . .

Defendant Roberts gave no indication of any continuing problems relating to the Eros roll-out. He only mentioned that the Company had resolved the "customer service bumps and bruises" caused by transitioning so many people in a short period of time. He echoed defendant DeSisto's comments to the effect that "the patient base ***is very happy with the product*** and ***things are going great***."

90. Further, defendant DeSisto stated that "[i]nternational demand of the new OmniPod also continues to be strong. Ypsomed noted earlier this week that since the beginning of the year the diabetes revenue has increased by more than 100% as compared to the prior year."

91. On November 7, 2013, Insulet filed its quarterly report with the SEC on Form 10-Q, which was signed by defendants DeSisto and Roberts. In multiple places in the Form 10-Q, the Company represented that its patient base was expanding:

> Our total revenue was $61.1 million and $178.6 million for the three and nine months ended September 30, 2013, respectively, compared to $54.8 million and $153.5 million for the same periods in 2012. ***The increase in the three and nine month periods is due to continued adoption of the OmniPod System by patients in the United States and internationally.***

* * *

> Cost of revenue was $33.7 million and $99.2 million for the three and nine months ended September 30, 2013, respectively, compared to $30.4 million and $86.5 million for the same periods in 2012. ***The increase in cost of revenue reflects the higher sales volumes as our patient base continues to increase.***
>
> * * *
>
> The decrease in inventories and increase in accounts payable, accrued expenses and other current liabilities are largely related to the scale up of our manufacturing operations as we transition our customer base to our new OmniPod System. . . . The increase in accounts receivable largely relates to the timing of shipments to customers and ***overall expansion of our customer base***.

92. The November 7, 2013 Form 10-Q also stated: "We believe our current manufacturing capacity is sufficient to meet our expected 2013 demand for OmniPods."

93. Analysts responded positively to these materially false and misleading statements. In a November 8, 2013 report, JP Morgan declared Insulet's performance "impressive," noting that during the third quarter Insulet "completed the heavy lifting of transitioning of its existing base to the new, smaller OmniPod. New patient additions remained robust during the quarter, growing over 40% YOY on a tougher sequential comp."

94. The statements set forth in ¶¶ 87-92, were materially false and misleading and omitted to disclose material facts, as follows:

a. Contrary to the defendants DeSisto's and Robert's statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been "remedied," and even though they had been identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user base was negatively impacted;

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems; and

d. The Individual Defendants failed to disclose the extent to which Insulet needed to rely on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth.

**5. False and Misleading Statements and Omissions in Connection with the Announcement of Insulet's Fourth Quarter 2013 and Fiscal Year 2013 Results**

95. On February 27, 2014, Insulet announced its financial results for the fourth quarter of 2013 and fiscal year 2013. In a press release issued that day, filed with the SEC on a Form 8-K and signed by defendant DeSisto, the Company represented that "[t]he increase in revenue is a result of continued strong patient adoption of the OmniPod insulin pump in the United States and international markets during the fourth quarter 2013."

96. Also on February 27, 2014, Insulet held an earnings conference call. During the call, defendant DeSisto boasted about the Company's new patient starts: "We finished the year

with ***new patient additions growing at a rate north of 40% year-over-year*** as our easy to use design appealed to customers[.]" Later in the call, in response to an analyst's question, defendant Roberts confirmed that new patient starts grew at least 40% in the fourth quarter of 2013 and 40% for the full year as well. When one analyst sought further clarification on Insulet's new patient start numbers, defendant Roberts refused to clarify the issue:

> Analyst: Just regarding your guidance for new adds growing over 25% this year, just to make sure the math is ballpark, ***are you implying the new adds will grow from about 20,000 last year to north of 25,000 this year?***
>
> Roberts: Mimi, I'm just going to leave the metric as is. I'll let you guys do the actual amounts for everybody's models. But we've mentioned that we're over 60,000 customers now and the expectation is 25% net patient adds or 25% patient adds in 2014.
>
> Analyst: ***And what percentage of the 60,000 is in the US?***
>
> Roberts: ***We're not going to break it up specifically***, but again we're over 60,000 patients now.

97. With respect to manufacturing matters, defendant DeSisto stated as follows:

> ***With manufacturing operations on solid footing as we enter 2014,*** we now have the opportunity to increase our efforts on the many products we have in our pipeline. . . .
>
> * * *
>
> I also want to thank Charlie [Liamos] for all of his efforts over the past three years in the role of COO. ***Charlie was kind enough to step in full time to manage the manufacturing transition to the new OmniPod and was instrumental in getting us to the solid ground that we are [on] today***. . . .
>
> In summary, I think it's obvious why we're so excited about the success of 2013 and the opportunity we see for 2014. We navigated a new product launch, a major scale-up in manufacturing and a customer base transition while continuing to also move forward on projects and initiatives that will carry us into the future of diabetes management and drug delivery. . . .
>
> * * *

> . . . .2013 was a tremendous year in Insulet history. ***We navigated through all aspects of the new OmniPod launch*** and are now full speed ahead towards an exciting 2014.

Moreover, rather than disclose the extensive product defect issues that had been identified in new Eros pods, defendant DeSisto stated: "in terms of the quality of product, I think [it] continues to improve out in the field. Part of that was education. It's a new product. So in that regard we're seeing improvement in all the numbers that we track."

98. In addition, both defendants DeSisto and Roberts touted international customer demand for the OmniPod Eros, particularly in Europe. According to defendant DeSisto, "Ypsomed in Europe has seen exceptional growth in key markets such as Germany, the UK and the Netherlands." Later in the call, he added, "So, if you look at the way the program is with Ypsomed, there are certain minimums that they are required to meet and that hasn't been a problem for them." Similarly, defendant Roberts represented that "[Ypsomed was] adding patients at a very rapid rate, and [ ] doubled their business in 2013."

99. On February 28, 2014, Insulet filed its fiscal year 2013 annual report with the SEC on Form 10-K, which was signed by, defendants DeSisto, Roberts, Liamos, Crawford, Fallon, Sobieski, Sommer and Zakrzewski. In multiple places in the Form 10-K, the Company represented that its patient base was expanding:

> Our total revenue was $247.1 million for the year ended December 31, 2013, as compared to $211.4 million for the year ended December 31, 2012. The increase in revenue is mainly due to the continued adoption of the OmniPod System by patients in the United States and internationally.
>
> * * *
>
> The decrease in inventories and increase in accounts payable, accrued expenses and other current liabilities are largely related to the scale up of our manufacturing operations as we transitioned our customer base to our new OmniPod System. The decrease in deferred revenue related to the recognition of revenue billed in prior periods as we met the revenue recognition criteria. The

increase in accounts receivable largely related to the timing of shipments to customers and overall expansion of our customer base.

100. The Form 10-K also represented the following:

***We believe our current manufacturing capacity is sufficient to meet our expected 2014 demand for OmniPods.***

* * *

Generally, all outside vendors produce the components to our specifications and in many instances to our designs, and they are audited periodically by our Quality Assurance Department to ensure conformity with the specifications, policies and procedures for our devices. ***Our Quality Assurance Department also inspects and tests our devices at various steps in the manufacturing cycle to facilitate compliance with our devices' stringent specifications.*** We have received approval of our quality systems standards from DEKRA Certification B. V., Arnhem, The Netherlands, an accredited Notified Body for CE Marking and the International Standards Organization ("ISO"). Certain processes utilized in the manufacture and test of our devices have been verified and validated as required by the FDA and other regulatory bodies. As a medical device manufacturer and distributor, our manufacturing facilities and the facilities of our suppliers and sterilizer are subject to periodic inspection by the FDA, KEMA and certain corresponding state agencies.

101. Analysts were once again successfully misled by these fraudulent statements. On February 28, 2014, JP Morgan issued an analyst report praising Insulet's 40% "[n]ew customer growth," stating that "[t]he company has moved past manufacturing supply constraints and end user demand remains robust for OmniPod both in the US and Europe[.]"

102. The statements set forth in ¶¶ 95-100 were materially false and misleading and omitted to disclose material facts, as follows:

a. Contrary to the Individual Defendants' statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been "remedied," and even though they had been

identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user base was negatively impacted;

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems;

d. The Individual Defendants failed to disclose the extent to which Insulet needed to rely on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth;

e. To conceal the U.S. decline, beginning in early 2014, the Individual Defendants switched new patient starts from being a U.S. metric to a global one, without telling investors that they were doing so. In other words, the Individual Defendants artificially inflated the market's understanding of U.S. patient growth by combining domestic and OUS new patients; and

f. The Individual Defendants' statement that Insulet had "navigated through all aspects of the new OmniPod launch" was materially false and misleading, as the manufacturing issues that resulting in inventory and growth problems were ongoing and had not been successfully navigated.

**6. The False and Misleading 2014 Proxy Statement**

103. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants likewise caused the Company to issue a false and misleading proxy statement, which sought shareholder votes for, inter alia, director re-election and executive compensation policies.

104. On April 3, 2014, the Individual Defendants caused Insulet to file with the SEC and disseminate to shareholders, a Proxy Statement on Form DEF 14A (the "2014 Proxy") in connection with the Company's annual shareholder meeting. The Individual Defendants drafted, approved, reviewed, and/or signed the 2014 Proxy before it was filed with the SEC and disseminated to Insulet's shareholders. The Individual Defendants knew, or were deliberately reckless in not knowing, that the 2014 Proxy was likewise materially false and misleading.

105. Among other things, the 2014 Proxy sought shareholder approval for (i) the election of three Class I directors (including defendants Crawford, Sommer, and Zakrzewski), each to serve for a three-year term, and (ii) the approval, on a non-binding, advisory basis, of the compensation of certain executive officers (including defendants DeSisto, Roberts, and Liamos).

106. With respect to the compensation of the Company's executives, the 2014 Proxy set forth to Insulet shareholders that the Company had a "pay-for-performance" philosophy. For example, the 2014 Proxy when discussing executive compensation stated, "For each individual, the amount of pay that is actually realized will be primarily driven by the performance of the Company and each individual's contribution to the performance. We believe this construct is a

key underpinning of our pay-for-performance philosophy." The 2014 Proxy further states, "Our overall compensation goal is to reward our executive officers in a manner that supports our strong pay-for-performance philosophy while maintaining an overall level of compensation that we believe is reasonable and competitive."

107. It is under this guise of "pay-for-performance" that the 2014 Proxy sets forth the following regarding the "principles and processes" used in determining executive compensation:

> Our overall compensation goal is to reward our executive officers in a manner that supports our strong pay-for-performance philosophy while maintaining an overall level of compensation that we believe is reasonable and competitive. We believe we accomplish this goal through the following principles and processes that we use in establishing compensation:
>
> *Benchmarking.* We benchmark executive officer compensation annually against an established executive compensation comparison group that the Compensation Committee reviews each year in order to ensure that our compensation programs are within the competitive range of comparative norms. Our executive compensation comparison group is identified based on industry comparability, annual revenue, market value, number of employees, business focus and corporate strategy.
>
> *Target Compensation.* We strive to have our overall total target compensation be between the 50th and 75th percentiles of the executive compensation comparison group, with the actual amount of compensation highly driven by performance. In making executive compensation decisions, our Compensation Committee reviews, with respect to each named executive officer, among other things, individual and Company performance, past compensation levels of each of our named executive officers, existing levels of equity ownership, and general trends in executive compensation.
>
> *Base Salaries.* In 2013, we adjusted the base salary of our Chief Executive Officer with a merit increase equal to 7%. We adjusted the base salaries of our other named executive officers with merit increases ranging from 3% to approximately 4%.
>
> *Short-Term Incentives.* Based on the levels of achievement of our corporate financial goals, the named executive officers earned an average of 97% of the target bonus tied to Corporate performance goals for 2013. The total bonus amounts awarded to our named executive officers for 2013 ranged from 90% to 100% of target. Total actual cash compensation for our named executive officers in 2013, including base salaries and actual short-term incentives, was

approximately at the 50th percentile of the executive compensation comparison group.

*Long-Term Equity Incentives.* In 2013, the Compensation Committee determined that a combination of stock options and restricted stock units was an appropriately balanced and competitive incentive and retention tool for our named executive officers. Consistent with our pay-for-performance philosophy, in 2013, the Compensation Committee also introduced performance shares with performance measures linked to revenue metrics. The performance shares were designed to reward our named executive officers with total long term equity at a level between the 75th percentile and the 85th percentile if the Company achieved strategic corporate performance levels.

*Actual Total Direct Compensation.* In 2013, the actual amount of total direct compensation, including long term equity incentives, paid to our named executive officers as a group was at approximately the 80th percentile of the companies included in the August 2013 executive compensation comparison group as a result of our strong corporate performance in 2013.

*Performance-Based Compensation.* A significant portion of total direct compensation is in the form of performance-based cash compensation and performance share equity, which are linked directly to Company performance and increased stockholder value. This approach ensures that there is an appropriate balance between our short- and long-term performance goals as well as a balance between the achievement of annual operating objectives and long-term delivery of stockholder return. Maintaining this pay mix results in a pay-for-performance orientation for our named executive officers, which is aligned with our stated compensation philosophy of providing compensation commensurate with overall delivery of corporate performance.

108. The Individual Defendants' statements in the 2014 Proxy that represented that the Company followed a pay for performance policy were false and misleading. The 2014 Proxy failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2014 Proxy was issued, the Individual Defendants already knew of the significant problems associated with the Eros rollout, and therefore as a result, the Company's purported financial performance (issued under the Individual Defendants' direction and on their watch) that the executive compensation was based upon was materially misstated.

109. Had the Individual Defendants made truthful disclosures in the 2014 Proxy, the executive compensation awarded to the Company's named executive officers would have been

severely curtailed. Specifically, the 2014 Proxy discusses how cash bonuses to certain of the Individual Defendants were explicitly tied to the Company's financial performance stating:

> The 2013 bonus program for each of our named executive officers includes bonuses tied to the achievement of corporate financial measures based on our annual revenues, EBIT, rate of customer retention, and operating profitability. Our 2013 revenue goal was $250 million and our 2013 EBIT goal was a negative $19.3 million. In conjunction with the completion of the audit of our 2013 financial statements, we reviewed our performance against these goals. The Compensation Committee determined that each named executive officer earned 98% of that portion of his bonus tied to the revenue goal and 102% of that portion of his bonus tied to the EBIT goal. Our 2013 operating profitability goal was to achieve cash flow break even by the end of the year. Our actual operating profitability goal was achieved in the fourth quarter of 2013. As a result, each named executive officer earned 100% of that portion of his bonus tied to the operating profitability goal. As a result, on account of the corporate financial goals, Mr. DeSisto earned a bonus of $326,880, Mr. Roberts earned a bonus of $116,550, Mr. Liamos earned a bonus of $130,900, Mr. Devlin earned a bonus of $107,800 and Mr. Diehl earned a bonus of $93,450.

110. It is clear that had truthful information been disclosed in the 2014 Proxy regarding the Company's performance and financial condition, defendants DeSisto, Roberts, and Liamos would not have received such massive cash bonuses.

111. Further, the 2014 Proxy was false and misleading because the Individual Defendants omitted any disclosures of the problems with the Eros roll out that already had a negative impact on Insulet's finances; the product defects plaguing Eros, the fact that Ypsomed had over-purchased Eros, and sluggish end-user sales of Eros.

112. Finally, if truthful disclosures been made in the 2014 Proxy, defendants Crawford, Sommer, and Zakrzewski would not have been re-elected to the Board.

113. Accordingly, the 2014 Proxy, as set forth above, was false and misleading when issued.

### 7. False and Misleading Statements and Omissions in Connection with the Announcement of Insulet's First Quarter 2014 Results

114. On May 7, 2014, Insulet announced its financial results for the first quarter of 2014 and held an earnings conference call. During the call, defendants DeSisto and Roberts boasted of Insulet's new patient starts. While defendant DeSisto acknowledged that "new patient starts in the first quarter slowed to a rate of about 20% year over year," he added that "***new-patient starts [so far in the second quarter] are running more than 40% higher than at the same point in the first quarter***." Similarly, defendant Roberts stated that ***"[n]ew patient starts so far this quarter being up over 40% from where we were at this point mid-February***" and that "***new-patient starts were up a little over 20%***" compared to the first quarter of the previous year.

115. Further, defendant DeSisto represented that "we have made significant progress regarding the consistency of our manufacturing process for the new OmniPod. Our daily production has become much more predictable, and our tolerance is better defined." He then elaborated that "[i]nventory levels have increased significantly as compared to the last half of 2013. ***Quality levels have improved, and scrap costs, which remained higher than planned in the first quarter, have started to decrease***."

116. Prompted by an analyst, defendant Roberts confirmed that the higher scrap costs were "***only in the manufacturing process***." The analyst followed up by asking, "[W]hat went wrong? Was there some new issue or a continuation that you didn't get the yield improvements you had expected? What exactly happened?" In response, Roberts continued to minimize Insulet's manufacturing and quality control problems:

> Yeah, I wouldn't say anything went wrong per se. I think it's just kind of normal course of running the lines and ultimately as you go through the process there were a few components where a product would come in that maybe was a little bit more on the edge of a tolerance or so, and we saw a higher output of scrap than we were hoping to see. And that's now allowed us to kind of revise the tolerance a little bit with the supplier. But there's some costs that you have to eat as part of

> that. I think there's a piece of it that just goes to the fact of we did experience the Chinese New Year effect, if you will, which is a lot of people leave. And then you have a new group of folks that come in and have to be trained. And while Flextronics did, I think, a nice job of trying to get ahead of that, there's always a training component that tends to lead to a little bit more incremental scrap, as well as those lines kind of restart themselves. But I wouldn't point to anything specific thing that anything went wrong in the quarter. To achieve 2.6 million Pods, I'd actually argue a lot went right.

117. During the May 7, 2014 call, defendant Roberts refused to respond to a question from Bill Plovanic, an analyst from Canaccord Genuity, who inquired about whether Insulet's international revenue exceeded 10% of its total revenue. Instead, defendant Roberts stated "we're not going to comment specifically on what the revenue number is . . . ."

118. On May 7, 2014, Insulet filed its quarterly report with the SEC on Form 10-Q, which was signed by defendants DeSisto and Roberts. In multiple places in the May 7, 2014 Form 10-Q, the Company represented that its patient base was expanding:

> Our total revenue was $69.2 million and $57.4 million for the three months ended March 31, 2014 and 2013, respectively. The $11.8 million increase is largely due to continued adoption of the OmniPod System by patients in the United States and internationally.
>
> * * *
>
> Cost of revenue was $36.4 million and $32.2 million for the three months ended March 31, 2014 and 2013, respectively. The $4.2 million increase is due to higher sales volumes in the United States and internationally.
>
> * * *
>
> The increase in accounts receivable largely relates to the timing of shipments to customers and overall expansion of our customer base. The increase in inventories is largely related to the scale up of our manufacturing operations as we continue to expand our customer base.

119. The Form 10-Q also stated: "We believe our current manufacturing capacity is sufficient to meet our expected 2014 demand for OmniPods."

120. Based on defendants DeSisto's and Roberts's statements, JP Morgan issued an analyst report on May 8, 2014, stating that "[n]ew customer growth decelerated to 20% in the first quarter from 40%+ the past two quarters, but has rebounded in 2Q with new patient growth up 40% so far vs. 1Q14." In addition, JP Morgan reiterated its view that "[Insulet] has moved past manufacturing supply constraints and end user demand remains robust for OmniPod both in the U.S. and Europe[.]"

121. The statements set forth in ¶¶ 114-119 were materially false and misleading, and omitted to disclose material facts, as follows:

a. Contrary to defendants DeSisto's and Roberts's statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been "remedied," and even though they had been identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user based was negatively impacted;

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international

growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems;

d. The Individual Defendants failed to disclose the extent to which Insulet needed to rely on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth; and

e. To conceal the U.S. decline, beginning in early 2014, the Individual Defendants switched new patient starts from being a U.S. metric to a global one, without telling investors that they were doing so. In other words, the Individual Defendants artificially inflated the market's understanding of U.S. patient growth by combining domestic and OUS new patients.

**8. Defendants' False and Misleading Statements and Omissions at the May 15, 2014 Bank of America Merrill Lynch Healthcare Conference**

122. On May 15, 2014, defendant Roberts participated in the Bank of America Merrill Lynch Healthcare Conference. In his opening remarks, he touted Insulet's new patient rate:

> [W]e've said last week and certainly believe that 2014, we're going to show 25% plus ***year-over-year patient starts***. Our first quarter is always historically our slower one. ***And we were 20% in the first quarter.*** We did discuss we're seeing sequential increase in Q2 versus Q1. What does that imply? Well, it really implies kind of closing in hopefully on the 30% year-over-year patient start number in Q2, which would keep us in line as we move forward to the rest of the year to hit north of that 25% mark.

He later explained that "[n]ew patient starts are critical though because ultimately that's the compounding for the future periods, as they continue to add to the base, we're able to drive more and more new customers. So again, this first bullet wasn't updated, but we grew 35% year-over-year in the first quarter for the core OmniPod business."

123. The statements set forth in ¶ 122 were materially false and misleading, and omitted material facts, as follows:

a. The Individual Defendants failed to disclose that the OmniPod Eros was plagued with the foregoing serious, undisclosed manufacturing and quality control problems, such that the Company's efforts to increase inventory supplies to support its roll-out efforts could only be effectuated by (a) materially lowering its QA standards and shipping defective product lots to its patients and distributors and thereby (b) negatively impacted the Company's ability to increase and maintain the growth of its patient base and of its OmniPod Eros sales levels to both existing and new patients;

b. The Individual Defendants failed to disclose the extent to which Insulet needed to rely on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth; and

c. To conceal the U.S. decline, beginning in early 2014, the Individual Defendants switched new patient starts from being a U.S. metric to a global one, without telling investors that they were doing so. In other words, the Individual Defendants artificially inflated the market's understanding of U.S. patient growth by combining domestic and OUS new patients.

**9. False and Misleading Statements and Omissions in Connection with the Announcement of Insulet's Second Quarter 2014 Results**

124. On August 7, 2014, Insulet announced its financial results for the second quarter of 2014 and held an earnings conference call. During the call, defendant DeSisto told investors that "we enter third quarter ***with our largest customer pipeline since the launch of the new OmniPod,***" and that ***new patient starts*** "***increased by approximately 20% year-over-year.***" Notwithstanding this strong growth, defendant DeSisto indicated that growth would have been

even stronger except that new patient starts were "impacted in the second quarter by a unilateral change made by a significant managed care plan to their reimbursement policies." Defendant DeSisto further noted that "[w]e are currently backlogged in new patient starts until [that] issue is resolved."

125. Defendant DeSisto also touted Insulet's manufacturing quality: "Turning to our manufacturing operations, for the third straight quarter we manufactured approximately 2.5 million OmniPods, providing the level of stability and predictability we haven't had in our history. At a consistent level of 40,000 OmniPods per day, we have been able to improve quality and reduce scrap costs, resulting in expanded gross margins." When one analyst asked whether the Company had "any manufacturing issues or concerns," DeSisto downplayed any such concerns, representing that the Company was "continu[ing] to make really good progress" in increasing its capacity and touting the "consistency" of Insulet's production.

126. On August 7, 2014, Insulet filed its quarterly report with the SEC on Form 10-Q, which was signed by defendants DeSisto and Roberts. In multiple places in the August 7, 2014 Form 10-Q, the Company represented that its patient base was expanding:

> Our total revenue was $72.0 million and $141.2 million for the three and six month periods ended June 30, 2014, respectively, compared to $60.1 million and $117.4 million for the same periods in 2013. ***The $11.9 million and $23.7 million respective increases are largely due to continued adoption of the OmniPod System by patients in the United States and internationally.***
>
> * * *
>
> Cost of revenue was $36.2 million and $72.6 million for the three and six months ended June 30, 2014, respectively, compared to $33.3 million and $65.5 million for the same periods in 2013. ***The $3.0 million and $7.1 million respective increases are due to higher sales volumes in the United States and internationally.***
>
> * * *

> The increase in accounts receivable largely relates to the timing of shipments to customers and ***overall expansion of our customer base***.

127. The August 7, 2014 Form 10-Q also stated: "We believe our current manufacturing capacity is sufficient to meet our expected 2014 demand for OmniPods."

128. Unbeknownst to Insulet's shareholders and the investing public, the reported 20% growth in new patient starts included non-U.S. growth in new patients. This deception led investors to believe that the metric represented just new U.S. customers. For example, an analyst report issued by Canaccord Genuity on August 7, 2015 stated: "***US new patient adds were solid, +20% Y/Y***, and in-line with our estimate despite the disruption." Similarly, on August 8, 2014, JP Morgan stated that excluding the impact of the payor reimbursement issue, "we estimate new patient growth would've been in the high-20%'s in 2Q." JP Morgan also noted that "underlying demand trends remain strong."

129. The statements set forth in ¶¶ 124-127 were materially false and misleading, and omitted to disclose materials facts, as follows:

a. Contrary to defendants DeSisto's and Roberts's statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been "remedied," and even though they had been identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients

and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user base was negatively impacted;

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems;

d. The Individual Defendants failed to disclose the extent to which Insulet needed to rely on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth; and

e. To conceal the U.S. decline, beginning in early 2014, the Individual Defendants switched new patient starts from being a U.S. metric to a global one, without telling investors that they were doing so. In other words, the Individual Defendants artificially inflated the market's understanding of U.S. patient growth by combining domestic and OUS new patients.

130. For reasons then mysterious to shareholders and the investing public, on September 16, 2014, Insulet's then-CEO, defendant DeSisto, abruptly resigned after 13 years at the Company, and was replaced as CEO on the same date by defendant Sullivan.

### 10. False and Misleading Statements and Omissions in Connection with the Announcement of Insulet's Third Quarter 2014 Results

131. On November 5, 2014, Insulet announced its financial results for the third quarter of 2014 and held an earnings conference call. During the call, defendant Roberts fielded

questions from analysts seeking clarification on new patient starts, a metric that was conspicuously not mentioned during Sullivan's and Roberts's opening remarks. First, an analyst asked, "can you talk a little bit about the new patient add trajectory in Q3 and what's implied in Q4? Was it plus/minus 20%?" Roberts answered, among other things, that:

> Overall, we saw probably somewhere about a 5% to 10% sequential increase in new patient starts from Q2 to Q3. Still on the trajectory ***I would tell you of kind of somewhere in the 15% to 20%*** range overall new patient starts year-over-year. And the trajectory still seems very solid here as we're a month and a few days into the fourth quarter.

Then another analyst posed a question about patient starts, and Roberts obfuscated:

> Analyst: So I guess maybe we could start with the new patient additions. And again, your comments, they definitely seem a little bit different than kind of the comments last quarter where I think expectations were around 20% new patient growth and doesn't sound like you gave sort of a new number. Yet the revenue guidance is coming down. And I guess what I'm trying to get at is there's obviously – there was a backlog of patients related to [payor issue]. Is the expectation that most of those start to flow in here in the fourth quarter? And even though they may not be big on the revenue side, they are going to be noticeable on the new patient additions?
>
> Roberts: I'm not sure I completely followed that. But we're – again where we're heading, just so we stay clear here is, on a year-over-year basis we've talked about that ***we're looking effectively for 20% year- over-year patient growth*** – new patient starts, and I think everything has been trending close to that number or probably a little lower than that at the moment. But again, if you look at the specific issue around the payer, that's been the one that's been driving it. On a quarter-over-quarter basis, Q2 to Q3, we've – I mentioned a couple minutes ago that we basically driving between kind of 5% and 10% sequential growth. So those are the two pieces.

132. On November 5, 2014, Insulet filed its quarterly report with the SEC on Form 10-Q, which was signed by newly installed CEO defendant Sullivan and defendant Roberts. In multiple places in the November 5, 2014 Form 10-Q, the Company represented that its patient base was expanding:

> Our total revenue was $75.0 million and $216.2 million for the three and nine month periods ended September 30, 2014, respectively, compared to $61.1 million and $178.6 million for the same periods in 2013. The $13.9 million and

> $37.6 million respective increases are largely due to continued adoption of the OmniPod System by patients in the United States and internationally.
>
> * * *
>
> The increase in accounts receivable largely relates to the timing of shipments to customers and overall expansion of our customer base.

133. The Form 10-Q also stated: "We believe our current manufacturing capacity is sufficient to meet our expected 2014 demand for OmniPods."

134. The statements set forth in ¶¶ 131-133 were materially false and misleading, and omitted to disclose materials facts, as follows:

a. Contrary to defendants Sullivan's and Roberts's statements above, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been "remedied," and even though they had been identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user base was negatively impacted;

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros

inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems;

d. The Individual Defendants failed to disclose the extent to which Insulet needed to rely on its low-margin Neighborhood Diabetes subsidiary to support the Company's reported revenue growth; and

e. To conceal the U.S. decline, beginning in early 2014, the Individual Defendants switched new patient starts from being a U.S. metric to a global one, without telling investors that they were doing so. In other words, the Individual Defendants artificially inflated the market's understanding of U.S. patient growth by combining domestic and OUS new patients.

135. On November 5, 2014, for reasons that were still withheld from shareholders and the investing public, Insulet announced that defendant Roberts had resigned from his position as CFO, effective November 6, and that defendant Dorval (who was then the Company's controller) would be replacing Roberts as CFO.

**11. The Truth Begins to Emerge**

136. After the close of the market on January 7, 2015, Insulet issued a press release announcing that it was reducing its revenue guidance for its fourth quarter ending December 31, 2014 from $76-$81 million to $71-$73 million and that it was cutting its full-year 2014 revenue estimate from $292-$297 million to $287-$289 million.

137. Also on January 7, Insulet announced an extraordinary overhaul of the Company's executive management. More specifically, the Company announced that its Chief Commercial Officer (Peter Devlin) had resigned and that it had hired a new Vice President of

Sales, a new Vice President of Marketing, a new Vice President of Managed Care, a new Vice President of Customer Care, and a new Vice President of International.

138. In response to the Company's January 7 press release, analysts expressed immediate skepticism that the entirety of Insulet's fourth quarter of 2014 revenue "miss" could have been due to a delay in non-insulin product shipments, which accounted for only a relatively small portion of Insulet's sales. Instead, and apparently based on additional guidance provided to them by the Company, analysts quickly attributed a material portion of the reduced guidance to reduced demand by distributors, who had begun to cut back on purchases of the OmniPod Eros. As a JP Morgan analyst report issued later that day stated:

> In what can only be described as a disappointing turn of events, Insulet pre-announced a surprisingly weak 4Q with guidance moving from $76-81M (+11-18%) to $71-73M (+4-7%) on delayed Amgen sales ($4-6M) and US OmniPod destocking ($1.5-$2.5M). The abrupt shortfall in the quarter is likely to catch the Street off guard, especially given new CEO Patrick Sullivan's upbeat commentary since stepping into the role in September . . . .
>
> Management blamed the [4th quarter revenue] miss on a delay in non-insulin drug delivery products, which we interpret as an initial Amgen stocking order; however, such an order was never publicly contemplated in guidance . . . .
>
> ***In our view, this brings two major questions to the forefront: (1) is the 4Q US OmniPod weakness reflective of a more endemic problem with underlying growth trends; and (2) how much will 2015 numbers have to come down?*** We expect both questions to be answered in detail next Wednesday . . . when CEO Patrick Sullivan presents at the JP Morgan Healthcare conference . . . .
>
> There appears to be diverging trends between direct US OmniPod sales and US distributor sales. US y/y growth in direct sales of OmniPod for diabetes was ~ 10% in the quarter, meaning US distributor sales were likely far below this and probably in negative territory. . . .
>
> The shortfall in US OmniPod sales outside of the Amgen order came from US distributors, where there was $1-$2M in destocking vs. a $4M stocking order last year on the OmniPod launch. Exiting 3Q13 when OmniPod supply was extremely tight, distributors (most of which stock inventory) padded their inventory levels in 4Q13 and probably 1Q14, followed by normal ordering patterns in 2Q-3Q14, Now entering 4Q14 with supply no longer an issue, several large distributors right sized their inventory to more normal levels, which led to a reduction of~ 3

> weeks of inventory. ***While it helps explain some of the miss in the quarter, it does little to assuage our fears about slowing underlying growth trends in this segment of the market (~35% of sales), although management believes that the destocking is now over.*** Since distributor vs. direct sales haven't been disclosed before, it[']s hard to gauge the exact impact, but we expect Insulet to provide a detailed breakout either at the JP Morgan conference next week or with 4Q earnings, and then on an ongoing basis.

139. Similarly, an analyst at Leerink published a "flash note" on January 7, 2015 which stated:

> Today after market close, PODD preannounced 4Q14 sales of $71-73M (+4-7%) from prior guidance of $76M-$81M and ***well below us and the Street*** at $79.2 and 79.6M, respectively… In 4Q14, the majority of the miss came from late December approval of partner AMGN's (MP) Neulasta. The remainder was a result of more aggressive distributor inventory workdowns after several quarters of stocking not that PODD's 2H13 manufacturing issues are fully resolved, leaving distributors more comfortable with PODD's ability to supply the market. Ultimately, PODD did see 10% y/y and q/q 4Q14 growth in its direct US diabetes business, which makes up ~65% of total US OmniPod sales.…
>
> ***US Diabetes Shortfall driven by Distributor Inventory Levels***. PODD noted that direct US diabetes sales – which make up 65% of total US diabetes sales – grew 10% y/y and q/q, as new patient adds again grew sequentially. But of the $5M to $8M 4Q 14 total sales shortfall,~1.5M (assuming the midpoint of the range) came from the US diabetes business. According to PODD management, distributors more aggressively reduced inventory levels in the quarter after ramping inventory in the last few quarters in reaction to 2H13 supply constraints. While a reduction in distributor inventory levels could continue into 1Q15, it seems that the worst is now past and levels should stabilize or improve from here.

140. The Company's disclosures of January 7, however, were only the tip of the iceberg, as Insulet's revised guidance did not disclose the true extent of the Company's issues. For example, the Leerink analyst report noted that although the pre-announced fourth quarter numbers were "clearly disappointing," it added that "the majority of issues impacting 4Q sales guidance do seem transitory in nature based on our early read, with no real change to long-term pump market dynamics or the ultimate drug delivery market opportunity." Similarly, a January 8, 2015 analyst report from Oppenheimer indicated that, in light of the Company's estimates,

"[w]e believe that inventory levels have now stabilized and [we therefore] model no further drawdowns in '15."

141. Just one week later, after the close of the markets on January 14, 2015, the Company presented at the JP Morgan Healthcare Conference. Insulet's new CEO, defendant Sullivan, stated that analysts' expectations of Insulet's performance in 2015 are "a tad bit high," and that the Company expected its earnings for the first quarter of 2015 to be flat sequentially over the fourth quarter of 2014 with a 10%-15% decrease in the core OmniPod business. As Sullivan stated:

> What I'd like to do now is take a couple of minutes to focus on some of the things, financial recap of Q4[2015]. Last week, we updated our top-line revenues for the fourth quarter in a press release.
>
> Our overall business, as you look at – was up 17% year over year. The main reason why we released early was because we missed our projections in the fourth quarter primarily due to our drug delivery business and, to a lesser extent, ***some destocking of distributors that we had on the US side.***
>
> We're going to give you much more color on the Q4 conference call … [but] as for 2015, I'm extremely excited about the opportunities. [However,] ***I've seen some of the [analyst] models that are out there, and I'd say in general they are a tad bit high…***

142. Unfortunately for Insulet shareholders and the investing public, defendant Sullivan's public remarks continued to be false and misleading. Various analyst reports confirm that Sullivan provided additional information to analysts at a breakout session at the JP Morgan conference held shortly after he delivered his main remarks. In his remarks, which were not revealed to the market until they were published in analyst reports after the close of trading on January 14, 2015, Sullivan admitted that the launch of the Eros system had gone much worse than had previously been disclosed to financial analysts or investors and that, as a result, instead of experiencing increasing new patient starts in the U.S., Insulet's new patient starts ***had actually declined by 9%*** in 2014. Moreover, defendant Sullivan acknowledged that Insulet had

effectively concealed these materially adverse facts by (a) changing the way the Company reported OmniPod new patient starts and (b) using certain large "stocking orders" by Ypsomed in Europe to mask disappointing sales figures in the critical, higher margin U.S. market.

143. In response to the disclosures of January 14, analysts and investors quickly concluded that Insulet was in far worse shape than even its disclosures of January 7 had indicated and that Insulet management had in fact been misleading investors as to the Company's true health, particularly with respect to the critical U.S. new patient starts metric. A January 15, 2015, JP Morgan analyst report stated:

> At the JP Morgan Healthcare conference on [January 14], Insulet CEO Pat Sullivan made a number of new disclosures around the health of the US OmniPod business, ultimately revealing that it's in worse shape than … prior management disclosure….
>
> The heart of the matter lies in the old management team's disclosures around the business, in particular new patient growth; new patients in the US were actually down 9% in 2014 compared to the +15-29% that investors believed as a result of previous management commentary….. ***[T]here's a credibility issue here….***
>
> To begin with, Mr. Sullivan disclosed that US new patient starts were down 9% in 2014 vs. the approaching +20% that prior management was committed to and was confident in as recently as the 3Q call [on November 5, 2014]. ***[Yesterday's] disclosures indicate that the US OmniPod underlying business was in worse condition than prior management comments led us to believe, and the mishandling of the Eros launch was more damaging than widely assumed. Part of what we learned [yesterday] is that following a strong Eros launch in 2013, new patient starts began to slow in the US in early 2014, but this was masked … by a large OUS [outside-the-US] stocking order from Ypsomed.*** Based on [yesterday's] disclosures, we now calculate 1Q14 US new patient growth to be flat to up low single digits vs. management's April [2014] commentary of 20%....
>
> In the quarters since, the business has struggled. ***In 2Q14, volumes improved sequentially, (~10%), but were[,] we [now] estimate[,] in all likelihood down 10%YoY [year-on-year]***. Contrast this with prior management comments on the 2Q [2014] call: "So far year to date, we're still up about 20% (in new patient starts)."
>
> Our read is that early in 2014 management switched "new patient starts" from being a US metric to a global one. Recognize that in Europe Insulet operates through a distributor (Ypsomed), so there's limited visibility into new patient adds

> or what's going on at the patient level. ***The Street was never told of this switch*****….**

144. Similarly, a William Blair & Co. analyst report published on January 16 stated:

> We received greater clarity into the global distribution of [Insulet's] new patient starts from management reflecting weaker-than-expected domestic patient growth, along with some perspective on the likely pace of growth re-acceleration over the course of 2015…
>
> ***Management disclosures have been incomplete, at best***…. The ways in which the company discussed revenue targets, patient starts, and crucially, the components of guidance shifted over the course of 2014, misleading investors as to the underlying health of the core OmniPod business. We now know that ***US patient starts were down 9% in 2014 from 2013***….

(Emphasis in original.)

145. In response to the disclosures on January 15, 2015, including the news that (mis)handling of the Eros product launch in 2013 was far worse than feared and that the Company had been masking the deterioration in its core business caused by manipulating its use of the "new patient starts" metric (while simultaneously concealing how it had used a single, large Ypsomed OUS stocking order to further conceal the decline in Insulet's primary U.S. business), the price of Insulet's stock declined from $38.50 at the close on January 14, 2015, to $31.86 per share at the close on January 15 – a further one-day decline of over 17%, on heavy volume.

146. Another JP Morgan analyst report, dated January 27, 2015, summarized the fiasco and the Individual Defendants' related distortions and misrepresentations as follows:

> It's still early in the fallout from Insulet's 4Q miss, weak 1Q guidance, and subsequent disclosures at the JPM Healthcare conference. It's clear from all our conversations the past 10 days that investors are still trying to piece together (a) what went wrong; (b) ***the disconnect between prior management's "reporting" on the business in 2013-2014 and what new management is reporting actually happened;*** and (c) what it all means for the company going forward. The picture has, in our view, started to clear, but there is still no shortage of questions that matter to the 2015-16 outlook, including (1) the damage caused by Insulet's botched second-generation [Eros] launch; (2) the impact of new and increased

competition; (3) the degree to which international revenues exceeded underlying demand in 2014, and the time it's going to take for demand to catch up (a headwind for international sales in 2015); and (4) the impact of a wholesale shakeup of senior management…

***What wasn't clear [to financial markets] at the time was the reputational damage that resulted from the troubled [Eros] launch***. We on the Street saw Insulet grow new patient starts by~30% in 2013 and US OmniPod sales by~20% on the back of the Eros launch, but what wasn't apparent was the mounting patient and physician frustration with the product. ***According to new CEO Pat Sullivan, as the Eros launch progressed, quality issues came to light, including occlusions and increased alarms.*** This was compounded by a significant pick-up in call center volumes that left patients waiting for hours to get help. By 4Q13 many physicians pulled back on their Eros prescriptions, which led to a sharp decline in new patient starts.

Adding to the underlying complexity were large distributor stocking orders in 4Q13 and 1Q14. In 4Q13, some US distributors (many of which have exclusive contracts with large managed care plans) questioned Insulet's ability to consistently supply Eros, and as a result they built a large inventory buffer. Also in 4Q13, Ypsomed, Insulet's European distributor, placed a $4 million bulk order, which ultimately slipped into 1Q14 due to capacity constraints.

***In early 2014 management switched "new patient starts" from being a US metric to a global one, which masked the underlying impact of the US slowdown***. Recognize that in Europe Insulet operates through a distributor (Ypsomed), so there's little to no visibility into new patient adds or what's going on at the patient level. The Street, in short, was never told of this switch, and the "new patient starts" number became increasingly guesswork, given little to no visibility into the OUS business.

At the [January 14] JPM Conference, Mr. Sullivan disclosed that US new patient growth was down 9% in 2014 vs. the approaching 20% that prior management was committed to and was confident in as recently as the 3Q call. ***The underlying US business was clearly in worse condition than prior management disclosed, and the mishandling of the Eros launch did more damage than anyone appreciated***.

147. In sum, rather than reveal to investors its manufacturing defect problems, the adverse impact of those problems on the Eros roll-out, and the resulting slowdown in the Company's growth, the Individual Defendants intentionally or recklessly concealed the truth about the Company's condition by changing the way it calculated and reported "new patient

starts" from being just a U.S. metric to a global metric. This shift was not disclosed to shareholders, the investing public, or analysts prior to January 14, 2015, leading investors to believe that the Company's reported new patient starts reflected only new U.S. patients.

148. Indeed, while the Individual Defendants previously reported to investors that Insulet's new patient starts increased by approximately 20% year-over-year in 2014, defendant Sullivan eventually disclosed the truth that the Company's new patient starts in the U.S. had actually decreased by 9% year-over-year. The 20% year-over-year increase included 57% growth from Ypsomed patient starts – even though investors and analysts had not been told that these Ypsomed new patients were apparently included in the 20% growth number. In fact, as of the end of 2014, 23% of Insulet's patients, or about 17,500 of its 75,000 patients were outside of the U.S. This was well-above what analysts and investors had been advised.

149. Not only did the Individual Defendants deliberately inflate the number of the Company's new U.S. patient starts by including sales to international customers, but they also inflated Insulet's level of international and domestic sales. As described above, Ypsomed's purchase volume was a function of its concern about Insulet's ability to timely produce reliable product. Also obfuscating the true level of Insulet's growth was the fact that some of the Company's U.S. distributors, who also questioned Insulet's ability to consistently supply reliable Eros units, placed abnormally large orders in the fourth quarter of 2013 and first quarter of 2014 in order to build an inventory buffer.

150. The Company's January 14, 2015, disclosures, however, were incomplete and failed to reveal the full extent of Insulet's woes.

151. On February 26, 2015, Insulet filed its fiscal year 2014 annual report with the SEC on Form 10-K, which was signed by defendants Sullivan, Dorval, Crawford, Fallon,

Liamos, Scannell, Sobieski, Sommer, and Zakrzewski. In multiple places in the Form 10-K, the Individual Defendants represented that the Company's patient base was expanding:

> Our total revenue was $288.7 million for the year ended December 31, 2014, as compared to $247.1 million for the year ended December 31, 2013. ***The increase in revenue is mainly due to the continued adoption of the OmniPod System by patients in the United States and internationally.***
>
> * * *
>
> The increase in accounts receivable largely relates to the timing of shipments to customers and ***overall expansion of our customer base***.

152. The Form 10-K also represented the following:

> ***We believe our manufacturing capacity is sufficient to meet our expected 2015 demand for OmniPods.***
>
> * * *
>
> Generally, all outside vendors produce the components to our specifications and in many instances to our designs, and they are audited periodically by our Quality Assurance Department to ensure conformity with the specifications, policies and procedures for our devices. ***Our Quality Assurance Department also inspects and tests our devices at various steps in the manufacturing cycle to facilitate compliance with our devices' stringent specifications.*** … Certain processes utilized in the manufacture and test of our devices have been verified and validated as required by the FDA and other regulatory bodies. As a medical device manufacturer and distributor, our manufacturing facilities and the facilities of our suppliers and sterilizer are subject to periodic inspection by the FDA, KEMA and certain corresponding state agencies.

153. The statements set forth in ¶¶ 136-152 were materially false and misleading for the following reasons:

a. Contrary to the Individual Defendants' statements contained in the 2014 annual report, and as reflected in the 2015 FDA Warning Letter, the OmniPod Eros units being produced had a high degree of defects in violation of the CGMP and Insulet's own manufacturing standards, including pods with defective needle mechanisms, leakage problems, and faulty alarm systems as described in ¶¶ 52-57 above. Those defects had not been

"remedied," and even though they had been identified by Insulet's "QA" process the defective product was still knowingly shipped to distributors and patients by the Company;

b. The Individual Defendants failed to disclose that the Eros was plagued with manufacturing and quality control issues and, as a result, the Company lowered its quality control standards in order to manufacture enough product to meet its roll-out targets to patients and distributors. By lowering the quality control standards and shipping defective product, the Company's ability to increase its new user base and maintain its current user base was negatively impacted; and

c. Insulet's statements concerning its international sales growth were materially misleading because the Individual Defendants failed to disclose that international growth was driven in significant part by Ypsomed's decision to build up a stockpile of Eros inventory, at a rate well beyond demand, in response to its concerns about Insulet's ability to provide adequate supplies of reliable product due to Insulet's manufacturing and related quality control problems.

154. While defendant Sullivan acknowledged Ypsomed's significant destocking, he attempted to attribute it solely to the fact that Ypsomed was simply reducing its "safety stock of inventory" given Insulet's improved production capacity. In light of this destocking, defendant Dorval announced 1Q 2015 guidance of between $67 million and $69 million. Nevertheless, CEO Sullivan represented to investors that the Company expected the destocking "to be finished this quarter and [Ypsomed would be] back to normal ordering patterns . . . in quarters two, three and four."

155. Analyst commentary also found additional evidence in the Company's February 26, 2015 disclosures that the Individual Defendants had previously misled investors. For

example, as a February 26, 2015, William Blair analyst report noted with respect to Insulet's additional disclosures as to the revenue it had historically received from one of its biggest – but lowest margin – U.S. distributors:

> **Neighborhood Diabetes was *How Much?*** In providing a detailed breakdown of historical revenue for the first time today, management again surprised investors by doubling the previously endorsed $30 million contribution from low-margin [U.S.] distributor Neighborhood Diabetes (ND) to $60 million. ***This is inconsistent with a disclosure by the former chief financial officer [defendant Roberts] on the second quarter 2013 investor call that led the sell-side to publish estimates showing ND at about $30 million. As a result, investors have been paying a revenue multiple for the OmniPod franchise about 60 basis points or 10% higher than we believed.***

156. The same William Blair report found further evidence in the Company's February 26, 2015 disclosures that the Individual Defendants had used Ypsomed's large stocking orders to "distort" Insulet's reported results for at least 2014. As the report stated:

> **International Guidance Reflects De-Stocking, Suggesting 2014 Results were Distorted.** Following recent domestic distributor restocking, management now also expects destocking by its international partner Ypsomed in the first quarter. As a result, while the installed base should grow by 40% on strong demand, it expects overseas revenue for 2015 to be ***flat***. We still believe our new patient add model is correct and that Ypsomed probably took on $10 million to $15 million of excess inventory last year to meet the required purchase minimums to extend [their distribution] contract out to mid-2018. While that is a bullish signal for long-term demand overseas, ***it suggests that the 2014 OmniPod end-demand was weaker than the reported result.***

157. Finally, the William Blair report also noted:

> After learning last month that new patient adds were well below what we have believed, ***with fourth quarter disclosures we learned that a fair number of patients do not use OmniPod consistently***. While management is rebuilding the team and boosting investments in sales and marketing, we do not expect to see a significant change in the weak patient add performance until the second half and for revenues to recover with a lag, creating a significant second half acceleration (against easy comparisons).
>
> As discussed above, we are discouraged by the piecemeal nature of the recent disclosures, but hopefully the story is now clear…

158. On March 4, 2015, defendant Sullivan, during a presentation at the Cowen & Co. Health Care Conference, again sought to assure investors that it was "very good to note that . . . we expect shipping product to Ypsomed this quarter. So, I think that destocking is essentially behind us in this first quarter."

159. The representations that Ypsomed was concluding its destocking and would return to its prior purchasing patterns soothed investors' concerns. Indeed, in the days following these assurances from defendants Sullivan and Dorval, Insulet's stock price climbed back to a high of $36.30 on March 16, 2015.

160. However, on March 30, 2015, Insulet abruptly announced that the Company's CFO, defendant Dorval – who had served as CFO for just over four months after replacing defendant Roberts in November 2014 – was resigning, effective May 4, 2015.

161. After the close of the markets on April 30, 2015, Insulet reported results for its first quarter of 2015. During the Company's earnings call later that day, defendant Sullivan announced disappointing revenue of just $61 million, compared to Insulet's prior guidance of $67 million to $69 million, which had been issued just two months earlier. Sullivan attributed the bulk of this stunning decline to Ypsomed's decision to continue to destock approximately $4 million of the excess inventory it purchased in prior quarters. While Insulet did announce that it had improved its level of new patient starts, it also disclosed that it had generated ***only $39.2 million*** from its U.S. OmniPod business, which was almost ***4% less*** than Insulet had generated in the first quarter of 2014. On this news, the price of Insulet's stock dropped from $29.85 to $26.97 per share, or almost 10%, on an unusually high trading volume of over 4.9 million shares.

162. On June 5, 2015, the FDA sent a warning letter to Insulet CEO Sullivan concerning the safety of Insulet insulin pods that had been manufactured and shipped between

mid-2013 and the first half of 2014 ("2015 FDA Warning Letter"). In particular, the 2015 FDA Warning Letter summarized the findings of an inspection of Insulet's headquarters facility that had taken place between March 11, 2015 and March 27, 2015, and which resulted in the FDA's issuance to Insulet of an FDA Form 483 "List of Inspectional Observations" (the "Form 483") on March 27, 2015. As subsequently stated in the 2015 FDA Warning Letter, the March 2015 inspection had found that certain lots of Insulet's EROS pods that the Company had released for shipment were "adulterated" in that "the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation" were in violation of both "current good manufacturing practice requirements" and Insulet's own "quality assurance final acceptance criteria."

163. The 2015 FDA Warning Letter also noted that the Company's COO, Patrick Ryan, had responded to the Form 483 on April 16, 2015, but that the FDA had "reviewed the response and … concluded that it is inadequate," as Insulet had not provided a sufficient description of the corrective actions it planned to implement to avoid further production and shipment of defective OmniPod products in the future. The 2015 FDA Warning Letter directed the Company to provide a list of those corrective actions and verify when the corrective actions were completed within 15 days.

164. On June 10, 2015, the Company issued a press release announcing the receipt of the 2015 FDA Warning Letter and stating that "[t]he issue noted in the warning letter relates to the Company's release of certain lots of EROS OmniPods" that "were manufactured in mid-2013 and the first half of 2014." Insulet's press release stated that Insulet "intends to respond to the issues raised in the FDA's letter within 15 days and is committed to resolving this issue with the

FDA," but did not disclose that the FDA had found the Company's earlier April 16, 2015 response to be inadequate.

165. After the close of the market on August 12, 2015, Insulet announced its financial results for the second quarter of 2015 (the quarter ended June 30, 2015). On the subsequent conference call later that day, defendant Sullivan admitted that – despite the Individual Defendants' prior assurances that any significant manufacturing quality issues with the Eros product had been "corrected" in early 2013 – product quality problems had actually continued throughout 2013 and into 2014. As defendant Sullivan stated:

> As we've reported previously, we received a warning letter relating to observations noted during the FDA's March 2015 inspection in our facilities in Billerica. The issue noted in the warning letter related to the Company's release of certain products of the new generation OmniPod in mid-2013 and the first half of 2014 which had been identified during the March [FDA] audit as non-conformant to final acceptance criteria.
>
> [These] quality issues … relate to the product issues associated primarily with the launch of the new OmniPod insulin delivery system back in 2013 and 2014. ***Those issues remained***. They were product performance issues during – into 2013 and 2014. Those issues have been ***largely*** remediated. But I would say there's always, in any disposable product, or any product for that matter, there's always sustaining engineering efforts that companies undertake to continuously improve the performance of the product in the field. And that's where we're in right now…

166. In addition to the costs of this recall, on the conference call Insulet's new CFO, Michael Levitz, also disclosed that as a result of allegedly new and improved "product quality" standards, in the second quarter "certain product and inventory did not meet the more stringent acceptance criteria that's now in place," with the result that the Company was increasing its write-offs for "scrap and warranty charges" by $2.5 million in the quarter – which in turn "negatively impacted [Insulet's] second quarter gross margins by approximately 4 [percentage] points."

167. On August 27, 2015, the Company issued a press release confirming that it had recalled 40,846 boxes of OmniPod product in response to the 2015 FDA Warning Letter "due to the possibility that some of the Pods from those lots may have a higher rate of failure than Insulet's current manufacturing standards." As the press release further stated:

> There are two ways in which these pods can fail at a rate that is higher than Insulet's current standard. The cannula may either completely retract or fail to fully deploy [i.e., there may be a needle mechanism failure], which may result in the patient not receiving the expected insulin dose. Or the Pod may trigger an audible alarm indicating it will no longer deliver insulin and will need to be replaced. Both situations can result in the interruption of insulin delivery that can cause hyperglycemia, which, if left untreated, can result in diabetic ketoacidosis (DKA).
>
> The affected Pod lots have resulted in 90 Medical Device Reports of which 13 required medical intervention.

168. The August 27 press release also confirmed that "OmniPods from the affected lots were distributed to customers from December 2013 to March 2015."

169. On August 11, 2016, Oliva, who was hired on March 15, 2013, as the Company's Director of Health Care Professional Marketing, filed a complaint against Insulet alleging wrongful termination and retaliation in violation of federal and Massachusetts statutes and Massachusetts common law. The *Oliva* Complaint shows that the change in CEOs did little to change the win at all costs environment created by the Individuals Defendants and alleges the following:

> On October 16, 2014, Oliva attended a meeting with numerous Insulet executives, including Sullivan. The meeting focused on Insulet's efforts to generate meaningful clinical data that would demonstrate Omnipod's effectiveness in managing type 1 diabetes. During the course of the October 16, 2014 meeting, Sullivan was informed that the biggest risk in seeking such clinical data is that the data could cast doubt on Omnipod's effectiveness. In response, Sullivan stated that Insulet could simply choose not to release unfavorable data concerning Omnipod's effectiveness. Recognizing that such non-disclosure would be improper and unlawful, Oliva opposed Sullivan's proposal. Specifically, he responded to Sullivan's statement by saying that if Insulet were to perform a

> study concerning Omnipod's effectiveness, the results of that study would have to be released, whether they were favorable or not. Undeterred, Sullivan suggested that Insulet could circumvent its legal obligations by conspiring to keep any unfavorable results secret. Specifically, he stated that Insulet conduct a small study "in the middle of nowhere Texas" and "if the data turns out bad for us – just bury it." Following the October 16, 2014 meeting, Sullivan continued to suggest that Insulet engage in conduct likely to result in violations of the Federal False Claims Act and the Massachusetts False Claims Act.
>
> * * *
>
> During a one-on-one meeting on November 7, 2014, Sullivan asked Oliva about his preparations for peer networking events. Among other things, Sullivan inquired as to how Oliva planned to get physicians to attend the event. Oliva responded that Insulet's field representatives would identify and recruit physicians who would be interested in the educational program being planned. In response, Sullivan said that he did not believe physicians would attend the events for their educational benefits and that Insulet should pay them to attend. The payments suggested by Sullivan are prohibited by both the Federal anti-kickback statute and the Massachusetts anti-kickback statute, which bar offering remuneration to physicians to induce them to recommend Omnipod to patients. At the November 7, 2014 meeting, Oliva told Sullivan, unequivocally, that such payments would be unlawful. Sullivan did not dispute that the payments he suggested would be unlawful. Rather, he pulled off his glasses, rubbed his eyes in frustration, and said "You gotta pay them. How else do you expect them to show up?"
>
> * * *
>
> Sullivan then turned to the subject of inducing physicians to attend the events, asking Oliva, "What is going to make them want to attend?" Oliva answered that Insulet was developing engaging content with highly respected physicians speaking on the company's behalf. Sullivan evinced frustration with this response and reiterated that physicians would attend the events only if they were paid to do so. Addressing Oliva's continued statement that such payments to physicians would be unlawful, Sullivan proposed a solution: he told Oliva to "put a check under their plates." Oliva firmly opposed Sullivan's proposal, again stating that it would be unlawful.

170. The *Oliva* Action is still pending.

## D. INSIDER SELLING BY DEFENDANTS LIAMOS AND DESISTO

171. Defendants Liamos and DeSisto sold substantial amounts of Insulet common stock at artificially inflated prices, reaping enormous proceeds, while they possessed material

non-public information regarding the quality and manufacturing issues with Insulet's OmniPod Eros, including its true new patient starts metrics and its ability to continue selling and shipping inventory to its main international distributor Ypsomed. The prices at which defendants Liamos and DeSisto sold their stock far exceeded the closing price of Insulet stock after the truth emerged about the Company's new patient starts metric and declining revenue from its US OmniPod business (*i.e.*, $26.97 per share on May 1, 2015).

172. During the period when Insulet's share price was artificially inflated, defendant Liamos sold more than 282,000 shares of Insulet common stock for proceeds of more than $10 million. Defendant Liamos's sales during this period far exceeded his pre-Eros launch sales. Specifically, in an approximately two-year period before the Eros launch, Liamos did not sell a single share of Insulet common stock.

173. The table below shows defendant Liamos's sales of Insulet common stock during the Relevant Period:

| **Defendant Liamos's Insider Stock Sales During the Relevant Period** | | | |
|---|---|---|---|
| **Date** | **Number of Share** | **Share Price (Approximate)** | **Total Proceeds (Net of any Commissions)** |
| 11/15/2013 | 28,400.00 | $35.53 | $1,008,929.88 |
| 11/15/2013 | 7,800.00 | $36.39 | $283,836.54 |
| 11/15/2013 | 4,600.00 | $36.86 | $169,550.02 |
| 11/18/2013 | 32,076.00 | $35.27 | $1,131,474.48 |
| 11/18/2013 | 7,124.00 | $35.72 | $254,496.35 |
| 12/2/2013 | 62,208.00 | $36.26 | $2,255,780.28 |
| 12/3/2013 | 1,600.00 | $36.00 | $57,596.00 |
| 1/2/2014 | 46,300.00 | $35.94 | $1,663,832.17 |
| 1/3/2014 | 39,700.00 | $36.12 | $1,433,801.23 |
| 2/3/2014 | 11,037.00 | $42.93 | $473,849.31 |
| 3/3/2014 | 10,000.00 | $45.85 | $458,465.00 |
| 9/10/2014 | 4,000.00 | $35.17 | $140,664.00 |
| 10/1/2014 | 4,000.00 | $36.58 | $146,320.00 |
| 11/3/2014 | 4,000.00 | $42.95 | $171,800.00 |

| | | | |
|---|---|---|---|
| 12/1/2014 | 4,000.00 | $45.67 | $182,680.00 |
| 1/2/2015 | 4,000.00 | $46.08 | $184,320.00 |
| 2/12/2015 | 4,000.00 | $32.00 | $128,000.00 |
| 3/2/2015 | 4,000.00 | $32.00 | $128,012.00 |
| 4/1/2015 | 4,000.00 | $33.16 | $132,640.00 |
| **Total** | **282,845.00** | | **$10,406,047.26** |

174. During the period when Insulet's share price was artificially inflated, defendant DeSisto sold more than 264,000 shares of Insulet stock for proceeds of nearly $10 million, which was more than 20 times his base salary for 2014. Most of DeSisto's sales occurred shortly after the Individual Defendants made false statements about Insulet's launch of the OmniPod Eros system.

175. The table below shows defendant DeSisto's sales of Insulet stock during the Relevant Period:

| **Defendant DeSisto's Insider Stock Sales During the Relevant Period** | | | |
|---|---|---|---|
| **Date** | **Number of Shares** | **Share Price (Approximate)** | **Total Proceeds (Net of any Commissions)** |
| 6/3/2013 | 20,000.00 | $29.76 | $595,100.00 |
| 7/1/2013 | 20,000.00 | $31.51 | $630,296.00 |
| 8/1/2013 | 20,000.00 | $31.85 | $636,916.00 |
| 9/3/2013 | 20,000.00 | $33.38 | $667,616.00 |
| 10/1/2013 | 5,527.00 | $36.33 | $200,805.86 |
| 12/2/2013 | 18,500.00 | $36.58 | $676,818.80 |
| 1/2/2014 | 20,000.00 | $36.07 | $721,374.00 |
| 2/3/2014 | 20,000.00 | $42.95 | $859,090.00 |
| 3/3/2014 | 20,000.00 | $45.80 | $916,098.00 |
| 4/1/2014 | 20,000.00 | $47.68 | $953,660.00 |
| 6/2/2014 | 20,000.00 | $34.75 | $695,086.00 |
| 7/1/2014 | 20,000.00 | $40.52 | $810,336.00 |
| 8/1/2014 | 20,000.00 | $34.23 | $684,672.00 |
| 9/2/2014 | 20,000.00 | $36.30 | $725,998.00 |
| **Total** | **264,027.00** | | **$9,773,866.66** |

176. As noted above, several senior executives were terminated or abruptly resigned as negative information about the Company was being disclosed. For example, on the heels of the Company's January 7, 2015 announcement that it missed its guidance for the fourth quarter of 2014, the Company announced that it would replace its Chief Commercial Officer, Vice President of Sales, Vice President of Marketing, Vice President of Managed Care, Vice President of Customer Care, and Vice President of International. In addition, on March 30, 2015, Defendant Dorval abruptly announced she would resign as CFO only four months after replacing Defendant Roberts (who had also resigned). Notably, this announcement also came just one month prior to the Company's disclosure on April 30, 2015, that the destocking issues it had earlier denied were ongoing were actually still plaguing the Company such that it caused Insulet to miss its guidance for the first quarter of 2015. The unusually high number of senior executives resigning, coupled with their timing and the surrounding circumstances, is an inference of knowledge the Individual Defendants had regarding the false and misleading statements as complained of herein. Indeed, the timing of Defendant Dorval's abrupt resignation strongly supports the inference that she knew about the Company's misleading reporting practices, or that she was recklessly disregarding them, and resigned rather than be held accountable for the fraud that occurred on her watch as Insulet's CFO.

**E. DAMAGES TO THE COMPANY**

177. As a direct and proximate result of the Individual Defendants' false and misleading statements as alleged above, Insulet is forced to defend itself in the Securities Class Action. Defendants DeSisto, Dorval, Roberts, and Liamos, as well as the Company, were all named as defendants in the Securities Class Action.

178. On March 16, 2017, Judge Mark L. Wolf of the United States District Court for the District of Massachusetts, denied Insulet's and the Individual Defendants' motions to dismiss the Securities Class Action.

179. Moreover, the Company was damaged due to the excessive and improper compensation paid to its officers on the basis of the false and misleading statements described above. As noted in the chart below, which was taken from the Company's 2015 Proxy Statement, defendants DeSisto, Liamos, Roberts, and Dorval received bonuses in excess of what they would have been had the truth been reported about the Eros launch and revenue actually being generated by Eros.

180. Pursuant to the Company's 2014 Proxy's Executive Compensation section, defendants DeSisto, Liamos, and Roberts all received bonuses based on meeting certain financial metrics as laid out in the below chart:

> For 2013, the mix of quantitative corporate financial goals, individual quantitative performance goals and individual qualitative performance goals for each of our named executive officers is set forth in the table below:

| | Quantitative Company Goals | Quantitative Individual Performance Goals | Qualitative Individual Performance Goals |
|---|---|---|---|
| Duane DeSisto(1) | 30% Revenue<br>30% EBIT<br>10% Retention Rate<br>10% Operating Profitability | — | 20% |
| Brian Roberts(2) | 25% Revenue<br>25% EBIT<br>10% Retention Rate<br>10% Operating Profitability | — | 30% |
| Charles Liamos(3) | 25% Revenue<br>25% EBIT<br>10% Retention Rate<br>10% Operating Profitability | 30% | — |
| Peter Devlin(4) | 25% Revenue<br>25% EBIT<br>10% Retention Rate<br>10% Operating Profitability | — | 30% |
| R. Anthony Diehl(5) | 25% Revenue<br>25% EBIT<br>10% Retention Rate | — | 30% |

| 10% Operating Profitability |
|---|

(1) For 2013, Mr. DeSisto's individual qualitative performance goals were based on the management of improved programs, execution of key initiatives, management of an effective strategic planning process and leadership of an organizational succession planning review.

(2) For 2013, Mr. Roberts' individual qualitative goals were focused on organizational development and talent management initiatives, leadership of investor relations efforts and strategic plan development.

(3) For 2013, Mr. Liamos' individual quantitative performance goals were based on reaching specified manufacturing capacity with respect to the new product and achieving defined product cost and scrap levels.

(4) For 2013, Mr. Devlin's individual qualitative goals were focused on the launch of the new product in the US.

(5) For 2013, Mr. Diehl's individual qualitative performance goals were focused on continuing to drive key legal initiatives and overall corporate compliance.

* * *

> The Compensation Committee determined that each named executive officer earned 98% of that portion of his bonus tied to the revenue goal and 102% of that portion of his bonus tied to the EBIT goal. Our 2013 operating profitability goal was to achieve cash flow break even by the end of the year. Our actual operating profitability goal was achieved in the fourth quarter of 2013. As a result, each named executive officer earned 100% of that portion of his bonus tied to the operating profitability goal. As a result, on account of the corporate financial goals, Mr. DeSisto earned a bonus of $326,880, Mr. Roberts earned a bonus of $116,550, Mr. Liamos earned a bonus of $130,900, Mr. Devlin earned a bonus of $107,800 and Mr. Diehl earned a bonus of $93,450.

181. Given the allegations contained above, Insulet would not have paid any bonus to defendants DeSisto, Liamos, or Roberts but for the wrongdoing described herein.

182. Insulet has expended – and will continue to expend – significant sums of money in connection with the Individual Defendants' wrongdoing identified herein. Such expenditures include, but are not limited to: (i) costs and expenses incurred by the Company in having to defend itself in the Securities Class Action; (ii) costs incurred from compensation and benefits that were based at least in part on Insulet's artificially-inflated financial performance; and (iii) costs incurred from the loss of confidence in Insulet and its management, as well as lost business opportunities arising from the Individual Defendants' false and misleading statements.

183. Moreover, these actions have irreparably damaged Insulet's corporate image and goodwill. For at least the foreseeable future, Insulet will suffer from what is known as the "liar's

discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Insulet's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### F. DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

184. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

185. Plaintiff brings this action derivatively in his right and for the benefit of Insulet to redress injuries suffered, and to be suffered, by Insulet as a direct result of the breaches of fiduciary duties by the Individual Defendants. Insulet is named as a nominal defendant in this case solely in a derivative capacity.

186. As alleged above, Plaintiff is currently an Insulet shareholder. Plaintiff also was an Insulet shareholder at the time of the breaches of fiduciary duties complained of herein. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in prosecuting this action. The wrongful acts complained of herein subjected, and continue to subject, Insulet to harm.

187. On December 2, 2015, Plaintiff made a demand on the Insulet Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Insulet to issue false and misleading statements regarding the sale of its OmniPod Eros insulin infusion system (the "Demand"). The Demand is attached hereto and made part hereof as Exhibit A.

188. On April 18, 2016, Plaintiff's counsel received a letter from attorney Daniel A. Dreisbach of Richards, Layton & Finger stating that his firm was retained by Insulet in connection with the Demand. A copy of the April 18, 2016, letter is attached hereto and made part hereof as Exhibit B.

189. In response to attorney Dreisbach's April 18, 2016 letter, on April 26, 2016, Plaintiff's counsel sent a letter to attorney Dreisbach providing Plaintiff's recent holding materials and asking for pertinent information regarding the formation of a demand review committee by Insulet's Board. A copy of the April 26, 2016, letter is attached hereto and made part hereof as Exhibit C.

190. On September 1, 2016, almost nine months after Plaintiff sent his Demand, Plaintiff's Counsel received a letter stating that an Independent Review Committee ("IRC") consisting of directors Dr. Jessica Hopfield and David Lemoine had been appointed by the Board. Notably, the September 1, 2016, letter provided none of the other information sought by Plaintiff in the April 26, 2016, letter. A copy of the September 1, 2016, letter is attached hereto and made part hereof as Exhibit D.

191. On October 20, 2016, Plaintiff's Counsel sent a letter to attorney Dreisbach seeking an update on the IRC's investigation of the Demand. A copy of the October 20, 2016, letter is attached hereto and made part hereof as Exhibit E.

192. On October 27, 2016, Plaintiff's Counsel received a letter that failed to substantively update Plaintiff regarding the investigation of the Demand. Rather, the letter summarily stated that the IRC "is continuing its investigation and has not made a final determination." A copy of attorney Dreisbach's October 27, 2016, letter is attached hereto and made part hereof as Exhibit F.

193. On February 22, 2017, still not having any substantive information regarding the investigation into the Demand, Plaintiff made a supplemental demand on Insulet (the "Supplemental Demand") that expanded on the allegations contained in the initial Demand. A copy of the Supplemental Demand is attached hereto and made part hereof as Exhibit G.

194. Having heard no response to the Supplemental Demand compounded with no further update on the investigation into the allegations in the initial Demand, on March 20, 2017, Plaintiff's Counsel once again sent a letter to attorney Dreisbach. Plaintiff's Counsel's March 20, 2017, letter discussed the Court's denial of the motions to dismiss the Securities Class Action and the fact that 15 months had since passed since the initial Demand. A copy of the March 20, 2017, letter is attached hereto and made part hereof as Exhibit H.

195. On March 21, 2017, attorney Dreisbach responded by stating that the IRC was considering expanding the scope of its investigation in response to the Supplemental Demand, but again failed to provide any pertinent information with regards to the IRC's investigation into the Demand. A copy of the letter is attached hereto and made part hereof as Exhibit I.

196. At the time this Complaint was filed, sixteen months have passed since Plaintiff made his Demand, more than a reasonable enough amount of time for the Board to undertake and complete a proper investigation. Having failed to do so, and having failed to keep Plaintiff abreast of whatever investigation is purportedly being done or when it might be completed, Plaintiff has no choice but to consider the Demand refused.

**COUNT I**
**AGAINST THE INDIVIDUAL DEFENDANTS**
**FOR BREACH OF FIDUCIARY DUTY**

197. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

198. The Individual Defendants owed and owe Insulet fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Insulet the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

199. All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

200. Each of the Individual Defendants had actual or constructive knowledge that the Company was experiencing production problems with the Eros, were shipping defective Eros products to distributors and were falsely reporting Eros user figures and associated revenue. These actions caused severe risks to the Company and were actually causing harm to the Company by subjecting the Company to the Securities Class Action. The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

201. The Individual Defendants caused or allowed Insulet to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding its ability to manufacture defect-free OmniPod Eros products, the success of Insulet's introduction of the Eros, and the revenue being generated by the sale of Eros products.

202. The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

203. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Insulet has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. The Individual Defendants breached their fiduciary duties owed to Insulet and its shareholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee Insulet's business, rendering them personally liable to the Company.

**COUNT II**
**AGAINST DEFENDANTS DESISTO, LIAMOS, AND ROBERTS**
**FOR UNJUST ENRICHMENT**

204. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

205. Defendants DeSisto, Liamos, and Roberts received performance-based compensation tied to the financial performance of Insulet. Because Insulet's financial results were inflated during at least 2013 as a result of the wrongdoing alleged herein, defendants DeSisto, Liamos, and Roberts received more compensation than they would have received had the truth regarding the manufacturing defects and sales of the OmniPod Eros been disseminated in a timely manner. Therefore, defendants DeSisto, Liamos, and Roberts were unjustly enriched at the expense of and to the detriment of the Company.

206. Defendants DeSisto, Liamos, and Roberts knew or should have known that the Company's representations regarding the Eros launch were false and misleading, all of which resulted in Insulet's financial results and performance being artificially inflated due to the wrongdoing identified herein.

207. By their wrongful acts and omissions, defendants DeSisto, Liamos, and Roberts were unjustly enriched at the expense of, and to the detriment of, Insulet.

208. To remedy defendants DeSisto's, Liamos's, and Roberts's unjust enrichment, the Court should order defendants DeSisto, Liamos and Roberts to disgorge any performance-based compensation that was received during, or as a result of, the Individual Defendants' breach of fiduciary duties complained of herein.

**COUNT III**
**BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION AGAINST THE INSIDER SELLING DEFENDANTS (DESISTO AND LIAMOS)**

209. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210. At the time of the stock sales set forth herein, defendants DeSisto and Liamos knew the information described above, and sold Insulet common stock on the basis of such information.

211. The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which defendants DeSisto and Liamos used for their own benefit when they sold Insulet common stock.

212. The Individual Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

213. Since the use of the Company's proprietary information for their own gain constitutes a breach of defendants DeSisto's and Liamos's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendants DeSisto and Liamos obtained thereby.

**COUNT IV**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF § 14(A) OF THE 1934 ACT AND SEC RULE 14A-9 PROMULGATED THEREUNDER**

214. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215. Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

216. The 2014 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Insulet shareholder votes for, inter alia, director reelection and executive compensation, while

simultaneously misrepresenting and/or failing to disclose the Company's inability to produce defective free Eros, the Company's European sales were artificially inflated well beyond then-existing and sustainable end-user demand in Europe, the Company's misleading reporting masked a decline in new patient growth in the U.S., and Insulet's much touted growth figures in the U.S. were a complete misrepresentation.

217. The Individual Defendants' statements in the 2014 Proxy, which clearly represented that the Company followed a pay for performance policy were false and misleading because the 2014 Proxy failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2014 Proxy was issued, the Individual Defendants already knew of the significant problems associated with the Eros rollout, and therefore as a result, the Company's purported financial performance (issued under the Individual Defendants' direction and on their watch) that the executive compensation was based upon was materially misstated.

218. The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2014 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2014 Proxy.

219. In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2014 Proxy were materially false and misleading.

220. The omissions and false and misleading statements in the 2014 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors and compensation for executive officers. In addition, a reasonable

investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2014 Proxy and in other information reasonably available to shareholders.

221. As a direct and proximate result of the dissemination of the false and/or misleading 2014 Proxy the Individual Defendants used to obtain shareholder approval of and thereby re-elect directors and pay excessive compensation to executive officers, nominal defendant Insulet suffered damage and actual economic losses (i.e., wrongful re-election of directors and paying compensation based on inflated financials to executives) in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Insulet and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C. Ordering defendants DeSisto, Liamos, and Roberts to disgorge any performance-based compensation that was received during, or as a result of, the Individual Defendants' breaches of fiduciary duties complained of herein;

D. Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

DATED: April 26, 2017

Respectfully submitted,

**LEVI & KORSINSKY LLP**

*/s/ Shannon L. Hopkins*
Shannon L. Hopkins (BBO# 657485)
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: 203-992-4523
shopkins@zlk.com

*Liaison Counsel for Plaintiff Raqim Walker*

**HYNES KELLER & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Phone: (484) 875-3116
mhynes@hkh-lawfirm.com
lhernandez @hkh-lawfirm.com

and

**BRAGAR EAGEL & SQUIRE, P.C.**
David J. Stone
Todd H. Henderson
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, NY 10022
Tel: (212) 308-5858
stone@bespc.com
henderson@bespc.com
fortunato@bespc.com

*Counsel for Plaintiff Raqim Walker*